[No. A121569. First Dist., Div. Four. Aug. 11, 2010.]

JAMES HOWARD et al., Plaintiffs and Appellants, v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY, Defendant and
Appellant.

[No. A123187. First Dist., Div. Four. Aug. 11, 2010.]

JAMES HOWARD et al., Plaintiffs and Respondents, v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY, Defendant and
Appellant.

502

504

**COUNSEL**

Law Offices of Tony J. Tanke, Tony J. Tanke; Reinhardt, Wendorf & Blanchfield and Mark A. Wendorf for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Glaspy & Glaspy, Inc., David M. Glaspy; Clyde & Co. US, Peter J. Whalen and Kathryn C. Ashton for Defendant and Appellant.

**OPINION**

**SEPULVEDA, J.**—James Howard, a young man molested as a child by a Catholic priest, sued the bishop who retained the priest in the diocese. A jury found the bishop liable for negligent retention, and the court entered judgment in the amount of $5.5 million: $2.5 million in compensatory damages and $3 million in punitive damages. The bishop settled with Howard while the case was on appeal, and agreed to join Howard in an action against the bishop's insurers to recover on the judgment and for bad faith failure to defend, settle, and indemnify the molestation case. This action against one of the defendant insurers, American National Fire Insurance Company (American), was adjudicated in a bench trial. The court found American liable for breach of contract and bad faith failure to defend, settle, and indemnify. The court awarded almost $3 million in damages. American appeals the judgment, and plaintiffs appeal the denial of prejudgment interest. In a separate appeal, American challenges the legal costs awarded to plaintiffs in a postjudgment order. We consolidated the two appeals for purposes of oral argument and decision. As discussed below, we modify the judgment to award prejudgment interest but affirm the judgment in all other respects. We also affirm the postjudgment order awarding costs, with one modification.

## I. FACTS

### A. *The underlying lawsuit and insurance coverage disputes*

A Catholic priest, Father Oliver O'Grady, sexually molested many young children over many years and was criminally convicted of child molestation in 1993. In 1994 and 1995, James Howard and his brother Joh Howard sued O'Grady and other defendants for damages suffered from the priest's molestation. The named defendants included the head of the diocese that employed O'Grady, the Roman Catholic Bishop of Stockton (Bishop), who is a corporation sole (a corporation of one person whose successor becomes the corporation on his death or resignation).

In his complaint, James Howard alleged that the Bishop employed O'Grady from approximately 1977 through 1991. James, who was born in June 1975, alleged that he was an active parishioner in the church from the time of his birth and that O'Grady regularly and repeatedly molested him "[b]eginning in approximately 1979" and continuing through about 1988. James Howard's younger brother, Joh Howard (born in Aug. 1978) alleged molestation by O'Grady "[b]eginning in approximately December 1984" through 1991.

The Bishop had several comprehensive general liability policies from different insurers and excess insurance policies as well. American insured the Bishop from November 1, 1978, to November 1, 1979, under a comprehensive general liability policy for all sums he became legally obligated to pay as damages for "bodily injury caused by an occurrence," defined as an "accident" resulting during the policy period in bodily injury "neither expected nor intended from the standpoint of the insured," including bodily injury caused by an employee's battery, up to a limit of $500,000 per occurrence. American also agreed to defend civil lawsuits brought against the Bishop. When the Bishop was sued for negligent retention of a molesting priest, the Bishop sought defense and indemnity from several insurers, including American. A number of insurers defended the Bishop. American did not. American maintained that the molestation was not covered by its policy because the molestation occurred after expiration of American's policy in November 1979, and thus it denied any duty to defend or indemnify. American also denied coverage for Joh Howard's claims, noting that Joh's complaint did not allege molestation prior to 1984.[1] As for James Howard, American's letter denying coverage made no mention of the complaint's allegation that James

---

[1] Joh Howard does not challenge the lower court's finding that American had no duty to defend the Bishop against his personal injury complaint. The case on appeal concerns James alone.

was molested beginning in about 1979. Instead, American relied upon statements James made during his deposition to conclude that the abuse really began in 1984.

James and Joh Howard made several pretrial settlement demands. In July 1997, they demanded $2.75 million each to settle. James reduced his demand to $2.3 million in October 1997 and to $1.85 million in April 1998. American did not offer any contribution toward settlement and refused to attend mediation sessions until the April 1998 mediation, where the lowest settlement demand was made. During that mediation, American said that it would contribute only "a minimal amount toward the settlement" and "no firm figure was given." Internal documents show that American's counsel had no authority to pay above $50,000 in settlement at the April 1998 mediation. The case did not settle.

Trial began in May 1998. The case was tried to a jury against a single defendant, the Bishop, and on a single cause of action, negligent retention or supervision. The jury found the Bishop negligent in the James and Joh Howard cases and assessed both compensatory and punitive damages. The jury found compensatory damages to be $3.05 million for James Howard and $3.3 million for Joh Howard. The jury also awarded punitive damages of $12 million for each plaintiff.

The trial judge reduced the awards in September 1998 on posttrial motions. Compensatory damages were reduced pursuant to Proposition 51, which limits liability for noneconomic damages in proportion to a defendant's percentage of fault. (Civ. Code, § 1431.1 et seq.) Here, the jury in the underlying case found the Bishop to be 80 percent at fault in the negligent retention of O'Grady and the court applied that percentage to reduce the amount of the compensatory damages assessed by the jury. The trial judge also found the punitive damages to be excessive and granted a remittitur of punitive damages from $12 million to $3 million for each plaintiff.

The final judgment, following postverdict motions, awarded compensatory damages of $2.5 million to James Howard and $2.75 million to Joh Howard. The Howards' punitive damages were $3 million each. Both the Howards and the Bishop appealed the judgment. The Howards maintained that the trial court improperly applied Proposition 51 to reduce the amount of compensatory damages awarded by the jury and sought reinstatement of all punitive damages. The Bishop sought an entirely new trial.

B. *Settlement and partial satisfaction of the underlying judgment*

The Bishop had difficulty providing the collateral necessary for an appeal bond. In November 1998, the Bishop paid $1 million toward satisfaction of

the punitive damages component of the judgment, to be credited equally between plaintiffs, in exchange for a stay of execution until January 1999. The Bishop felt that the assets of the diocese were at risk and, in early 1999, the Bishop negotiated with the Howards and various insurers to settle the litigation.

Two of those insurers, Century Indemnity Company and related entities (CIGNA) and St. Paul Fire & Marine Insurance Company (St. Paul), had contributed to the Bishop's defense while reserving their rights to contest coverage under their policies. In February 1999, CIGNA agreed to pay the Bishop its remaining policy limits of $956,342.12, plus interest on that amount from the date of judgment and CIGNA's share of costs taxed against the Bishop, in partial satisfaction of the judgment. Likewise, in March 1999, St. Paul agreed to pay the Bishop its remaining policy limits of $2,339,000 plus interest and costs in partial satisfaction of the judgment.[2] Both insurers gave the Bishop permission to allocate the payment to either of the two Howards and among any claims, except punitive damages.

In May 1999, the Bishop finalized a settlement agreement with the Howards. At the time, the Howards had a judgment awarding James $5.5 million and Joh $5.75 million. Against that combined total of $11.25 million, the Bishop had already paid $1 million. The settlement agreement provided for an additional, immediate cash payment of $6,655,442.[3] That payment was funded by the CIGNA and St. Paul payments of their policy limits, described above, combined with the Bishop's payment of $3,067,397. The Howards equally divided the $6,655,442 cash payment between themselves. Each received $3,327,721.[4]

All sums paid under the agreement were said "to compensate plaintiffs for their physical injuries and sickness caused by the events underlying" their lawsuit against the Bishop for negligent retention of O'Grady. The parties agreed that the Howards "may allocate any and all payments received by

---

[2] The amount of St. Paul's payment is sometimes said to be $2,339,221. We use the figure of $2,339,000, which is stated in the settlement agreement. In any event, the difference is immaterial to resolution of the appeal.

[3] There is some confusion in the record about the amount of the cash settlement payment. The Howards say the payment was $6,295,000 and cite a March 1999 letter using that figure in a discussion of the settlement. The trial court sometimes listed that figure, and sometimes others. American says the payment was $6,655,442, and this is the amount stated in the May 1999 settlement agreement. This amount is consistent with other documents in the record. We use the $6,655,442 figure stated in the settlement agreement. As with the minor discrepancy noted above concerning the amount of St. Paul's contribution to the settlement, the difference is immaterial to resolution of the appeal.

[4] The Howards did not actually recover the entire settlement amount because they had to pay their attorney fees and costs. We state here the gross amounts received in the various settlements.

them under this agreement among their respective claims and interests as they, in their sole discretion, see fit." The Bishop also agreed to prosecute litigation against his insurers and to pay the Howards the proceeds from that litigation. In exchange for the Bishop's payments and promises, the Howards released him from all claims. The parties dismissed their appeals, rendering the judgment final.

C. *Initiation of this lawsuit by the Bishop as insured and the Howards as judgment creditors*

In October 1999, the Howards filed a complaint against the Bishop's insurers as judgment creditors seeking to collect on their judgment and claiming bad faith refusal to pay the judgment. The Bishop filed a separate complaint against the same insurers for breach of contract and bad faith breach of the insurance contracts in failing to defend, settle, and indemnify the Howards' claims against him. The complaints were consolidated in the trial court.

The defendant insurers included American, CIGNA, and St. Paul. In 2003, CIGNA and St. Paul reached a partial settlement of the coverage litigation with plaintiffs.[5] The parties agreed to submit insurance policy benefit claims to a private judge and settled the amount of "noncontractual claims," such as bad faith, at $75,000 to be paid by each insurer to plaintiffs at the conclusion of the trial. CIGNA and St. Paul also assigned to plaintiffs the insurers' contribution rights against American for defense costs the two insurers incurred in the underlying Howard litigation.

CIGNA and St. Paul later reached a comprehensive settlement with plaintiffs that included a release of policy claims. CIGNA paid the Howards a total of $425,000, of which $75,000 was for noncontractual claims as previously negotiated in the January 2003 partial settlement agreement. St. Paul agreed to pay plaintiffs $825,000 "for alleged compensatory damages awarded for alleged bodily injury sustained by the Howards arising from the events and circumstances underlying the Howard action and post judgment interest . . . ." St. Paul paid an additional $75,000 for noncontractual claims, as previously negotiated. The two insurers' assignments to plaintiffs of contribution rights against American were reaffirmed in these later settlement agreements.

Meanwhile, plaintiffs' claims against American proceeded to trial. Plaintiffs and American agreed to a bench trial by retired Justice Steven Stone of

---

[5] The agreement was written in October 2002 but not fully executed until January 2003. Documents in the record sometimes refer to this agreement as "the October, 2002 contract."

JAMS, appointed as a temporary judge of the superior court and privately compensated by the parties. The parties retained their rights to appeal. The trial between plaintiffs and American was bifurcated into liability and damages phases with a statement of decision issued after each phase. The court's statement of decision on liability was issued in December 2005, and the final decision on damages issued in January 2008. Judgment was filed in March 2008.

The court found that James Howard was sexually molested during American's policy period, which triggered coverage under the policy, and that American, in bad faith, breached its duty to defend, settle, and indemnify the underlying litigation brought by James against the Bishop. American was ordered to pay almost $3 million, as follows: (1) American's per occurrence policy limit of $500,000 to James Howard as a judgment creditor; (2) $75,523.87 to plaintiffs as assignees of St. Paul and CIGNA in contribution for defense fees and costs and independent counsel fees and costs in the underlying action; (3) bad faith damages of $1,533,698 to reimburse the Bishop for settlement payments he made to James, and the further amount of $194,817.17 to reimburse the Bishop for his out-of-pocket payment of attorney fees and accounting expenses incurred postjudgment in the underlying action; and (4) $661,719.97 to reimburse attorney fees incurred to compel payment of benefits due under the insurance policy. The court also awarded plaintiffs costs of suit, to be assessed later. In a postjudgment order, the court awarded costs of $93,827.07.

American filed a timely notice of appeal from the judgment in May 2008, and plaintiffs cross-appealed. American challenges the judgment on numerous grounds and contests both the trial court's liability findings and its calculation of damages. Plaintiffs dispute the trial court's refusal to award them prejudgment interest. In a separate appeal, American disputes the court's postjudgment award of costs. The parties completed briefing on appeal in 2010. We consolidated the two appeals for purposes of oral argument and decision.[6]

## II. DISCUSSION

A. *American had a duty to indemnify the Bishop for damages assessed in the underlying litigation and James Howard, as a judgment creditor, was entitled to recover against American on that judgment*

■ Liability insurance obligates the insurer to indemnify the insured against third party claims covered by the policy by settling the claim or

---

[6] A third appeal by American is pending and will be separately determined. (*Howard v. American National Fire Ins. Co.* (A126699).) That appeal challenges a postjudgment order approving plaintiffs' settlement with another insurer, Centennial Insurance Company.

paying any judgment against the insured. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 7:500, p. 7B-1 (rev. # 1, 2009).) Where judgment is obtained against an insured in an action based on bodily injury, death, or property damage, the plaintiff (now a judgment creditor) may bring an action against the insurer on the policy, subject to the policy's terms and limitations, to recover on the judgment. (Ins. Code, § 11580, subd. (b)(2).) In short, the " 'judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits.' " (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68 [131 Cal.Rptr.2d 777] (*Shafer v. Berger, Kahn*).) Among the elements that must be proven is that " 'the policy covers the relief awarded in the judgment . . . .' " (*Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 710 [10 Cal.Rptr.3d 724].)

It is undisputed that James Howard obtained a judgment against the Bishop, American's insured, for compensatory damages of $2.5 million. The dispute at trial was "whether James Howard was injured (i.e., sexually molested) during the American insurance policy period from November 1, 1978 through November 1, 1979, such that coverage was triggered under the policy." The court found that plaintiffs met their burden of proving, by a preponderance of the evidence, that "James Howard was sexually molested by Father O'Grady during the American policy period."

The court's finding of molestation during the policy period is supported by substantial evidence. As the trial court observed, "Father O'Grady was a voracious sexual predator of children in 1979 and during that time he repeatedly had unfettered access to James Howard." During 1979, O'Grady frequently was in the Howard home, often staying overnight and sleeping with James. In 1993, James told the police that his sexual molestation by O'Grady first started "probably [in the] late seventies" when James "was around four or five years old." James Howard was born in June 1975, and he was therefore four years old in June 1979, in the midst of the American policy period. Other evidence likewise supports the court's finding of molestation in 1979, when James was four years old. James was interviewed by church officials in 1993, and told them that O'Grady molested him "from when [he] was aged 4" and later repeated that the molestation "first took place when [he] was about 4." O'Grady was deposed in 2000, during the course of this coverage litigation, and initially testified that he had sexual contact with James in the 1970's (he later equivocated and invoked the 5th Amend.).

American does little to deny the force of this evidence. American even concedes that "O'Grady was a sexual predator" and "he abused James." But

American argues that the evidence presented *in the underlying litigation* failed to show that O'Grady abused James during the 1979 policy period and that the court in this coverage action erred in considering evidence (like the police report) not presented in that underlying litigation. American insists that the only evidence admissible in this coverage action is the evidence that was presented to the jury in the underlying litigation. American is mistaken.

■ Insurance coverage and personal injury liability present distinct issues. "Generally speaking, in an action by an injured party against the party who allegedly caused the injury the court does not adjudicate the issue of insurance coverage. The only questions litigated are the defendant's liability and the amount of damages. The plaintiff is not concerned with the theory of liability which produces victory; only with procuring the largest possible judgment. Similarly, the defendant is concerned only with avoiding, or at least minimizing, a judgment for the plaintiff. [Citation.] Whether the plaintiff's loss is covered by the defendant's insurance is not germane to the action, and evidence on that issue would be excluded as irrelevant." (*Schaefer/Karpf Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306, 1313 [76 Cal.Rptr.2d 42].) The evidence presented in the underlying litigation is properly focused on questions of liability, not insurance coverage, and therefore does not necessarily dictate the scope of evidence in a later coverage action.

The underlying litigation may, of course, impact issues in the coverage litigation. A party may be collaterally estopped from relitigating issues actually litigated in the underlying litigation. (*Schaefer/Karpf Productions v. CNA Ins. Companies, supra,* 64 Cal.App.4th at pp. 1312–1313.) Generally, the issues litigated in the underlying litigation are the defendant insured's liability and the amount of damages suffered by the injured party, not coverage issues. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 15:1083 to 15:1086, pp. 15-188 to 15-189 (rev. # 1, 2009).) Accordingly, it has been held that a jury's finding that the injured party suffered property damage for purposes of establishing liability and assessing damages was not conclusive against the insurer on the distinct issue of whether the damages suffered were covered by insurance as property damage under policy terms. (*Schaefer/Karpf, supra,* at p. 1314.)

The underlying litigation may also impact issues in the coverage litigation by application of the simple principle that the duty to indemnify "is determined by the actual basis of liability imposed on the insured." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 108 [52 Cal.Rptr.2d 690].) Where a jury expressly imposed liability on the basis of trademark infringement and the insurance policy excluded coverage for trademark infringement, no indemnification was due. (*Palmer v. Truck Ins.*

*Exchange* (1999) 21 Cal.4th 1109, 1113–1114, 1120 [90 Cal.Rptr.2d 647, 988 P.2d 568].) The insured was not permitted to recharacterize the injury as an advertising injury in a later coverage action. (*Id.* at p. 1120.)

■ These cases do not assist American. The exact dates of molestation were not adjudicated in the underlying litigation and thus provide no grounds for invoking the doctrine of collateral estoppel. It is true, as American notes, that the timing of the molestation was a subject of testimony in the underlying litigation and a necessary element of plaintiffs' contention that the Bishop had reason to know, before James was molested, that O'Grady posed a risk to children. But the specific dates of James's molestation—and whether those dates fell within the insurance policy term—were not adjudicated. As for the basis of liability, the jury in the underlying action found that James was injured by the Bishop's negligent retention of O'Grady, which clearly falls within the policy's coverage provisions. American misconstrues *Palmer v. Truck Ins. Exchange, supra*, 21 Cal.4th at page 1120 (and similar cases) in arguing that California law requires that plaintiffs "prove that James's judgment against the Bishop was based on the jury's acceptance that James was molested during American's policy period." Plaintiffs were not required to prove molestation within the policy period in the underlying action. It is sufficient that plaintiffs proved to the jury that James was molested by a priest negligently retained by the Bishop (establishing a basis for liability encompassed by the policy) and later proved, in this coverage action, that the molestation occurred within the policy period.

In a related argument, American maintains that plaintiffs should have been precluded from introducing evidence of molestation during the policy term of 1979 because the evidence contradicts James's testimony in the underlying litigation placing the start of molestation in 1980. The argument rests on James's response to a single question when he was asked at the 1998 trial, "When in time is your first memory of Oliver O'Grady violating you?" and James answered, "It's probably five or six years old." American points out that James was five years old in June 1980, seven months after the American policy expired.

■ American makes too much of this testimony. James testified about his "first memory" of molestation, not the first actual incident of molestation; vaguely said he was "probably" five or six years old; and gave his testimony in a context where the exact time that the molestation started was immaterial. As the trial court noted, "the fact that James Howard testified that his first memory of the abuse was 'probably' at [five or six] years of age establishes that James Howard was simply estimating an answer to a question that was entirely irrelevant to the issues actually being litigated before the jury." The trial testimony is far too uncertain to constitute a binding admission. "An

unclear or equivocal statement does not create a binding judicial admission." (*Stroud v. Tunzi* (2008) 160 Cal.App.4th 377, 385 [72 Cal.Rptr.3d 756].) A court may disregard fragmentary and equivocal statements, especially when contradicted by other credible evidence. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482 [261 Cal.Rptr. 735].) Here, there was other credible evidence. Among that evidence were James's 1993 interviews with the police and church officials, which predated the trial testimony, in which James reported molestation in 1979, when he was four years old. As the trial court noted, these early reports of molestation in 1979 "were given long before coverage under the 1979 American insurance policy was an issue—indeed, long before anyone even knew that American insured the Bishop at that time. James Howard's lack of incentive to report molestation in 1979 lends additional credence and veracity to the statements." The trial court was not precluded from considering these statements and other evidence proving molestation in 1979, despite James's trial testimony suggesting a later time. Substantial evidence supports the trial court's finding of molestation during the 1979 policy period. James Howard, as a judgment creditor, was thus entitled to proceed directly against American, as an insurer covering the defendant Bishop, and obtain satisfaction of the judgment. (*Shafer v. Berger, Kahn, supra,* 107 Cal.App.4th at p. 68.)

B. *The trial court properly calculated the amount of recovery on the judgment*

As noted above, a " 'judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits.' " (*Shafer v. Berger, Kahn, supra,* 107 Cal.App.4th at p. 68.) The trial court here ordered satisfaction of the judgment up to the amount of American's policy limit: $500,000. On appeal, American argues that the judgment was partially satisfied by other insurers, leaving only $292,794 in compensatory damages unpaid, and that an award of $500,000 creates a double recovery. The trial court considered this argument and disagreed with American's calculations, finding that any offset against the judgment for settlement payments made by other insurers would still leave over $500,000 in compensatory damages unpaid, and thus required American to pay its policy limit. The trial court was correct.

■ "To prevent a double recovery, equity demands credit be given for payments received on the judgment. Such a balance acts as an offset against the judgment. 'At common law, a setoff is based upon the equitable principle that parties to a transaction involving mutual debts and credits can strike a balance between them.' [Citation.] Setoffs routinely are allowed in actions to enforce a money judgment. [Citation.] The right of offset rests upon the inherent power of the court to do justice to parties appearing before it.

[Citations.] . . . [¶] It is the rule that 'if one joint tortfeasor satisfies a judgment against all joint tortfeasors the judgment creditor cannot obtain a double recovery by collecting the same judgment from another of the tortfeasors.' [Citation.] The rationale is that '[a]n injured person is entitled to only one satisfaction of judgment for a single harm, and full payment of a judgment by one tortfeasor discharges all others who may be liable for the same injury.' [Citation.] . . . '[W]here fewer than all of the joint tortfeasors satisfy less than the entire judgment, such satisfaction will not relieve the remaining tortfeasors of their obligation under the judgment. Stated otherwise, "partial satisfaction has the effect of a discharge pro tanto [for so much]." ' The single satisfaction rule is equitable in nature, and its apparent purpose is to prevent unjust enrichment. [Citation.] The plaintiff is entitled only to a single recovery of full compensatory damages for a single injury." (*Jhaveri v. Teitelbaum* (2009) 176 Cal.App.4th 740, 753–754 [98 Cal.Rptr.3d 268], italics omitted.)

We are concerned here with insurers, not joint tortfeasors, but similar rules apply to prevent an insured or injured party from receiving a double recovery. "The fact that several insurance policies may cover the same risk does not increase the insured's right to recover for the loss, or give the insured the right to recover more than once. Rather, the insured's right of recovery is restricted to the actual amount of the loss. Hence, where there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery. Similarly, the liability of the remaining insurers to the insured ceases, even if they have done nothing to indemnify or defend the insured. They remain liable, however, for contribution to those insurers who have already paid on the loss or for the insured's defense." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1295 [77 Cal.Rptr.2d 296], italics omitted.)

Here, James Howard received a judgment awarding compensatory damages of $2.5 million. In May 1999, the Bishop settled the underlying litigation while it was on appeal, and two insurers contributed to that settlement. The insurer settlement agreements expressly stated that they were in partial satisfaction of the judgment. St. Paul paid $2,339,000, and CIGNA paid $956,342.12, which amounts were divided equally between plaintiffs James and Joh Howard. The insurers paid additional amounts for postjudgment interest. James Howard's share of the principal payments was $1,647,671. This effectively reduced James's judgment for compensatory damages from $2.5 million to $852,329. American does not dispute this calculation.

American's dispute rests with the insurers' later settlement payments during this coverage litigation. St. Paul, in 2005, and CIGNA, in 2006, settled

coverage litigation brought by both the Bishop and the Howards. St. Paul paid plaintiffs $825,000, and CIGNA paid $350,000 (excluding payments for noncontractual claims, such as bad faith). James received 47.62 percent of these payments, which was his pro rata share of the compensatory damages judgment. American maintains that the entire amount James received from these settlements ($559,535) should be offset against the $852,329 judgment balance, reducing the outstanding judgment (and American's liability) to $292,794. The trial court questioned if these settlements constituted a partial satisfaction of the underlying judgment that entitled American to an offset but ultimately found it "immaterial whether or not the other insurer's payments are properly offset from the James Howard judgment." The court held, assuming an offset was proper, that only $326,129 should be offset because $233,406 of the total amount received in settlement was for postjudgment interest. The court therefore concluded that over $526,000 remained unpaid on the judgment, and thus American was liable for the full amount of its policy limit.

■ The trial court was correct in apportioning the settlement payments between principal and interest. Money received in satisfaction of a money judgment is credited against accrued interest, and then to the principal amount of the judgment remaining unsatisfied. (Code Civ. Proc., § 695.220, subds. (c), (d).) American does not dispute this legal principle but argues that there was no accrued interest, either because interest was separately paid (as it was in the prior settlements) or no interest accrued after May 1999 when the Bishop settled with the Howards.

American is wrong on both points. The 2005 and 2006 settlements, unlike the prior settlements in 1999, paid lump sums rather than separate principal and interest payments. St. Paul's 2005 settlement agreement states that it agrees to pay $825,000 "for alleged compensatory damages awarded for alleged bodily injury sustained by the Howards arising from the events and circumstances underlying the Howard action and postjudgment interest in a check made payable" to plaintiffs' attorneys' trust account. Plainly, there was a single payment of $825,000 for compensatory damages *and* postjudgment interest. There is no evidence to the contrary. CIGNA also made a lump-sum payment.

The court also properly found that interest accrued from the time of the judgment in 1998. It is not true, as American asserts, that interest stopped accruing in 1999, when the Bishop settled with the Howards. That settlement did not satisfy the judgment in full. Interest accrues on any unpaid principal of a money judgment remaining unsatisfied. (Code Civ. Proc., § 685.010, subd. (a).) The trial court's only error, if any, was in calculating interest on the amount of the individual settlement payments, instead of the amount of

the entire outstanding judgment. But the parties do not raise this issue on appeal, and the calculation favored American in lessening the amount of the settlement payment attributed to interest. However the interest is calculated, whether based upon the amount of the outstanding judgment or upon the amount of the individual settlement payments, over $500,000 remained unpaid on the judgment. James Howard, as a judgment creditor, was entitled to recover $500,000 from American.

## C. *American breached its duty to defend and owed contribution to the defending insurers*

The trial court found that American had a duty to defend the Bishop in the underlying litigation brought by James Howard and breached that duty. The defense of the Bishop fell to his other insurers, who shouldered the expense through trial. Two of those insurers, St. Paul and CIGNA, assigned to plaintiffs their contribution claims against American for defense costs. The court calculated the amount of the two insurers' right of contribution from American at $75,523.87 and awarded that amount to plaintiffs as the insurers' assignees.

American disputes the trial court's liability finding and its calculations. As to liability, American maintains that a duty to defend is determined at the time the insured tenders the insurance policy and, at that time, the facts known to American showed that the molestation of James occurred outside its policy period. American also questions the basis for awarding any recovery, even if it did have a duty to defend. American argues that an insured cannot recover for breach of the duty to defend if the insured is fully defended by other insurers and denies plaintiffs' entitlement to receive contribution as assignees of defending insurers. As for the calculation of the amount due, American writes a single sentence in its appellate brief to say that the trial court's calculations "are incorrect in a number of ways" including giving American no offset for expenses attributable to defending Joh Howard's portion of the underlying case and awarding American's full share of expenses despite the fact that only two of four defending insurers assigned plaintiffs their rights to these expenses. American's claims are meritless.

 "Liability insurance usually imposes two separate obligations on the insurer: (1) to indemnify its insured against third party claims covered by the policy (by settling the claim or paying any judgment against the insured); and (2) to defend such claims against its insured (by furnishing competent counsel and paying attorney fees and costs)." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:500, p. 7B-1, italics omitted.) The duty to defend is generally determined "from all of the information available to the insurer at the time of the tender of the defense," although later

developments may impact the insurer's duty to defend. (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 92 [9 Cal.Rptr.2d 894]; see *Marie Y. v. General Star Indemnity Co.* (2003) 110 Cal.App.4th 928, 957 [2 Cal.Rptr.3d 135] [amended complaint triggered duty]; Croskey et al., *supra*, ¶ 7:517, p. 7B-8 (rev. # 1, 2009).)

The duty to defend is broader than the duty to indemnify. Indemnification is due for claims actually covered by the policy but an insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168], original italics.) "[A] bare 'potential' or 'possibility' of coverage [is] the trigger of a defense duty." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) Unresolved factual disputes impacting insurance coverage do not absolve the insurer of its duty to defend. "If coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend." (*Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1068 [34 Cal.Rptr.3d 136], italics omitted.)

Substantial evidence supports the trial court's finding that American had a duty to defend the Howard litigation. The Howard complaint alleged that the Bishop (American's insured) negligently retained O'Grady who "regularly and repeatedly sexually molested" James "[b]eginning in approximately 1979." In James's 1996 deposition, which was conducted and reviewed before American reached a decision on the tender of defense, James testified that he had "vague memories of the occasions in which [O'Grady] molested [him] in the home and [he] believe[d] that they started during the late '70s era." This information raised the possibility that the molestation occurred during American's 1979 policy period and triggered its duty to defend.

American's sole reason for denying a defense, then and now, rests on a different part of James's deposition, where he described specific recollections of molestation and said the first one he could recall (with details as to "places, things, images, [and] memories") was a weekend spent at the rectory after watching a movie, Romancing the Stone (Twentieth Century Fox 1984). That movie was not released in theatres until 1984, years after expiration of American's insurance policy. American claims that James's deposition testimony negated any possibility that James was molested during its policy period, thus absolving the insurer of any duty to defend. The claim is spurious.

At his deposition, James testified that his first childhood memory of O'Grady was at his brother's baptism in 1978 and that the molestation

occurred "as often as [the priest] was involved with [the Howard] family" with molestation activity occurring "somewhere between 100 and 200 times." James said he could not describe every incident. James testified that O'Grady molested him in the Howard family home "many, many times" but could only "bring forth specific images and times where it was more . . . lucid than others." James described several specific incidences that occurred outside his home, of which the rectory incident following the movie was the first. The movie incident was the first detailed incident James recounted; it was not the first time he was molested. James's testimony, when read in context, makes this clear. James explained that he had "only vague memories of the occasions in which [O'Grady] molested [him] in the home, and [he] believe[d] that they started during that late '70s era." The movie incident was the first detailed incident James could tie to a specific date, and James said that incident occurred "in the early '80s."

As the trial court properly found, "when reading the deposition in proper context, it is apparent that James Howard was not testifying that the 'Romancing the Stone' incident was the very first time he was molested by O'Grady, since, moments before he gave that testimony he stated under oath that he had vague recollections of being abused in the family home in the late '70's era. [¶] . . . [¶] It is clear from the deposition of James Howard, taken as a whole, that he was not providing a complete chronology of the 100 to 200 times he was sexually molested by O'Grady, but rather the specific incidents of abuse he testified to such as the 'Romancing the Stone' incident, were simply specific incidents that he had a more vivid recollection tied to a particular place and date. The deposition testimony of James Howard hardly precludes the possibility that James Howard was sexually molested by Father O'Grady in 1979." American had a duty to defend the Howard litigation.

■ American argues that, assuming a duty to defend, its failure to defend was not an actionable breach because the Bishop suffered no damages since other insurers provided a defense. It is true that, "to support an action at law for breach of contract, the plaintiff must show it has suffered damage." (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1088 [31 Cal.Rptr.3d 43].) It is also true that "[t]he *general* measure of damages for a breach of the duty to defend an insured . . . are the costs and attorney fees expended by the insured defending the underlying action." (*Id.* at pp. 1088–1089, italics added.) An insured fully defended by one insurer may have no damages to assert against a nondefending insurer. (*Id.* at p. 1093.) But it is not true that an insured necessarily suffers "no damages from an insurer's breach of the duty to defend whenever the insured receives a defense under any policy." (*Risely v. Interinsurance Exchange of the Automobile Club* (2010) 183 Cal.App.4th 196, 215 [107 Cal.Rptr.3d 343].) "In cases in which the insured faces potential liability beyond the policy limits of the defending insurer's policy, courts have

concluded that an insured can demonstrate that he has suffered damages from an insurer's breach of the duty to defend, apart from defense costs, in the form of exposure to personal liability." (*Ibid.*) Here, American's failure to defend, coupled with its failure to settle, exposed the Bishop to a ruinous judgment and led the Bishop to settle the Howard case after judgment when American again breached its duties under the insurance policy and refused to indemnify the Bishop. Moreover, the Bishop did incur some defense costs. Other insurers provided a defense through trial but the Bishop was required to hire attorneys after trial when the appeal was pending. An insurer's duty to defend does not end at trial. (*Jenkins v. Insurance Co. of North America* (1990) 220 Cal.App.3d 1481, 1489 [272 Cal.Rptr. 7].) The trial court properly found that American breached its duty to defend.

In any event, the court did not award damages for a contractual breach of the duty to defend but for tortious bad faith breach of American's multiple duties to defend, settle, and indemnify, as discussed below. Any success American might have in overturning the lower court's finding of breach of the duty to defend would therefore have no impact on the judgment awarding the Bishop damages caused by American's failure to settle and indemnify. Nor would it have any impact on the separate matter of coinsurer contribution, to which we now turn.

As noted above, the trial court found that American's failure to defend left the Bishop's other insurers with a disproportionate share of defense expenses. Two of the defending insurers, St. Paul and CIGNA, assigned to plaintiffs their contribution claims against American for defense costs. The court calculated the amount of the two insurers' rights of contribution from American at $75,523.87 and awarded that amount to plaintiffs as the insurers' assignees. The award was correct.

■ "Equitable contribution apportions costs among insurers sharing the same level of liability on the same risk as to the same insured, and is available when several insurers are ' "obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." . . . "The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." ' " (*Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 879 [44 Cal.Rptr.3d 841].) Equitable contribution thus "permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk." (*Fireman's Fund Ins. Co. v. Maryland*

*Casualty Co., supra*, 65 Cal.App.4th at p. 1293, italics omitted.) It is well established that an insurer that defends the insured is entitled to equitable contribution from a coinsurer that fails to defend. (*Id.* at p. 1289.)

American argues that plaintiffs never pleaded a right to equitable contribution and thus are not entitled to such relief. It is true that plaintiffs failed to amend their complaint to allege a right to equitable contribution after plaintiffs received an assignment of rights from St. Paul and CIGNA during the course of this coverage litigation. But the failure is not fatal to recovery. "It is well settled that the failure of a complaint to state a cause of action is not fatal to a judgment for the plaintiff unless the appellant can show that the error has resulted in a miscarriage of justice. Where the parties at the trial treat a certain issue as being involved, and the judgment is based on that issue, it is not a prejudicial error that the complaint defectively alleges or fails to allege at all that issue." (*Page v. Page* (1962) 199 Cal.App.2d 527, 532 [18 Cal.Rptr. 897].) As our Supreme Court has explained, "variance between pleadings and proof is not a basis for reversal unless it prejudicially misleads a party. A variance must be disregarded if the issues on which the decision is actually based were fully and fairly tried." (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143–144 [181 Cal.Rptr. 732, 642 P.2d 792].)

The issue of contribution was fully litigated below. Plaintiffs' trial brief discussed the insurers' assignment of the right to contribution and argued that "plaintiffs are entitled to recover under those contribution rights." American's trial brief addressed the issue in depth. American did not object to the variance between plaintiffs' complaint and their trial claim for contribution; it addressed the merits of the claim. American treated the issue of equitable contribution as involved in the case, and the issue was fully and fairly tried. Under these circumstances, the complaint's failure to allege a right to contribution does not justify overturning the judgment awarding contribution. (*Franz v. Board of Medical Quality Assurance, supra*, 31 Cal.3d at pp. 143–144; *Page v. Page, supra*, 199 Cal.App.2d at p. 532.)

Finally, we reach American's challenge to the calculation of the amount of contribution. As we observed earlier, American writes a single sentence in its appellate brief to say that the trial court's calculations "are incorrect in a number of ways" including giving American no offset for expenses attributable to defending Joh Howard's portion of the underlying case and awarding American's full share of expenses despite the fact that only two of four defending insurers assigned plaintiffs their rights to these expenses. Conclusory assertions of error are ineffective in raising issues on appeal. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

On the record presented, we find no error. The trial court did not apportion defense costs incurred in the underlying litigation between the claims of James and Joh Howard because, as the court explained, the claims "arose out of a common core of facts, namely the Bishop's negligence in allowing Father O'Grady to have access to the Howard family, which was common in both cases. Virtually all fees incurred were reasonably necessary to defend the Bishop in the James Howard case, even if the Joh Howard case had never been brought." American provides no argument or authority to dispute this ruling.

American also provides no support for its assertion that the court awarded American's full share of expenses when only St. Paul and CIGNA (not all defending insurers) assigned plaintiffs their rights to these expenses. The record indicates that the court limited the contribution award to those defense costs due St. Paul and CIGNA, not all defending insurers, as American claims. The court's statement of decision on damages shows that the court apportioned defense costs among coinsurers and awarded *only* the amount that St. Paul and CIGNA paid in excess of their proportionate share of the obligation. The calculations appear correct, and have not been demonstrated to be erroneous. American was properly ordered to make an equitable contribution toward defense costs.

## D. *American breached its duty to settle the underlying Howard case*

"In each policy of liability insurance, California law implies a covenant of good faith and fair dealing. This implied covenant obligates the insurance company, among other things, to make reasonable efforts to settle a third party's lawsuit against the insured. If the insurer breaches the implied covenant by unreasonably refusing to settle the third party suit, the insured may sue the insurer in tort to recover damages proximately caused by the insurer's breach." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 312 [84 Cal.Rptr.2d 455, 975 P.2d 652].)

The trial court here found that American breached its duty to settle the underlying Howard case. American disputes this finding on appeal. American maintains that (1) there was never a settlement demand within American's $500,000 policy limit so it alone could not have settled the Howard case; (2) the settlement demands were unreasonably high; and (3) the insured was never exposed to personal liability in excess of the aggregate limit of all his insurance policies and thus was unharmed by any failure to settle.

In support of the first argument, American relies upon single-insurer cases where the insurer's "refusal to accept an offer of settlement within the policy limits" is said to be a necessary factor in finding breach of the duty to

settle. (E.g., *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198].) The reason is obvious: causation. An insurer does not breach the duty to settle if it never had an opportunity to settle. In a single-insurer case, the opportunity to settle is typically shown by proof that the injured party made a reasonable settlement offer within the policy limits and the insurer rejected it. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:288, p. 12B-16 (rev. # 1, 2009).) But we are not here concerned with a single insurer. Although there was never a settlement demand within American's $500,000 policy limit, there was a settlement demand for $1.85 million that was well within the primary insurance policy limits of the multiple insurers on the risk, which totaled almost $4.3 million. That fact is relevant in evaluating whether an insurer, in a multiple-insurer case, had an opportunity to settle. When multiple insurance policies provide coverage, each insurer's obligation is to cover the full extent of the insured's liability up to policy limits. (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., supra*, 45 Cal.App.4th at p. 106.) American did not respond to the settlement demand with its policy limits and, had it and other insurers done so, could have settled the litigation. As the trial court observed, the law "cannot excuse one insurer for refusing to tender its policy limits simply because other insurers likewise acted in bad faith. If this were not the case, insurers on the risk could simply all act in bad faith, thus immunizing themselves from bad faith liability."

"Moreover, in deciding whether or not to compromise the claim, the insurer must conduct itself as though it alone were liable for the entire amount of the judgment. [Citation.] Thus, the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer. Such factors as the limits imposed by the policy . . . or a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one." (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 16 [123 Cal.Rptr. 288, 538 P.2d 744] (*Johansen*).)

This brings us to American's second claim: that the settlement demands were excessive because the ultimate judgment was not likely to exceed the amount of the settlement offer. This is a difficult argument to make where, as here, the ultimate judgment *did* exceed the amount of the settlement offer. James Howard's settlement demand was for $1.85 million and judgment was entered for $2.5 million in compensatory damages. The size of the judgment recovered in a personal injury action "furnishes an inference that the value of the claim is the equivalent of the amount of the judgment . . . ." (*Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 431 [58 Cal.Rptr. 13, 426 P.2d 173].) Of course, "the finder of fact must take into account that information

available to the insurer at the time of the proposed settlement." (*Camelot by the Bay Condominium Owners' Assn. v. Scottsdale Ins. Co.* (1994) 27 Cal.App.4th 33, 48 [32 Cal.Rptr.2d 354].)

American argues that James Howard's settlement demand seemed excessive at the time it was made and notes that the Bishop's defense counsel in the underlying case never valued James's case above $1 million (excluding punitive damages). But defense counsel also reported his nationwide search of jury verdicts in cases with similar facts, in which he found a verdict range from $150,000 to $10 million. Counsel gave his estimated value of the Howard case with the cautionary note that "[t]hese cases are difficult to evaluate." Others involved in the litigation warned that priest molestation cases could subject a diocese to substantial jury verdicts. An attorney for the diocese wrote to American and other insurers to advise them that the Howards could each document $400,000 in special damages (for psychological care) "before the jury even evaluates general damages." The diocese attorney also reported a then recent judgment against a diocese in Dallas for $120 million. Substantial evidence supports the trial court's finding that James Howard made a reasonable settlement offer in asking for $1.85 million and that the ultimate judgment was likely to exceed the amount of the settlement offer, which it did.

Moreover, there is no evidence that American ever relied on defense counsel's valuation of the case in refusing to settle. American's position was that there was no coverage under its insurance policy, and thus it would contribute little or nothing in settlement, regardless of the reasonableness of the amount of the proposed settlement. Therefore, if American means to suggest that it acted in good faith reliance on advice of counsel, the suggestion is refuted by the record. American refused to settle because it claimed the molestation was not covered by its policy. Having taken that position and then rejecting a reasonable settlement offer, American is liable for wrongful failure to settle. (*Johansen, supra,* 15 Cal.3d at pp. 15–17.)

American's third basis for denying liability is that the insured Bishop was never exposed to personal liability for compensable damages in excess of the *aggregate* limit of his insurance policies, and thus was unharmed by American's failure to settle. The primary insurance policy limits of the multiple insurers on the risk totaled almost $4.3 million, and the final judgment of $11.25 million awarded compensatory damages of $2.5 million to James Howard. The $2.5 million awarded as compensatory damages, which was the insurable component of the judgment, thus exceeded American's policy limit of $500,000, but did not exceed all policies on the risk.

In most cases, an excess judgment (a judgment against the insured in an amount exceeding policy limits) is needed to establish liability and damages

for wrongful refusal to settle. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:355, p. 12B-33 (rev. # 1, 2008).) An example illustrates why this is so. If a single insurer with a $2 million policy limit refuses to settle for $1.85 million and judgment is entered for $1 million there is no liability (insurer properly evaluated the claim's value as less than the settlement offer) and no damages (the insured is covered for the full amount of the judgment and need not pay from the insured's own funds). Although an excess judgment is the common way in which an insured establishes liability and damages in a failure to settle case, it is not the only way.

An insurer's wrongful failure to settle may be actionable even without rendition of an excess judgment. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 12:391 to 12:391.2, p. 12B-38 (rev. # 1, 2009); see *Camelot by the Bay Condominium Owners' Assn. v. Scottsdale Ins. Co., supra,* 27 Cal.App.4th at p. 48 ["there is no explicit requirement for bad faith liability that an excess judgment is actually suffered by the insured . . ."]; see also *Larraburu Brothers, Inc. v. Royal Indemnity Co.* (9th Cir. 1979) 604 F.2d 1208, 1214 ["to say that a subsequent verdict within policy limits always exonerates an insurer for the consequences of an earlier failure to settle seems to us an unwarranted restriction on the insurer's duty to the insured under California law"].) An insured may recover for bad faith failure to settle, despite the lack of an excess judgment, where the insurer's misconduct goes beyond a simple failure to settle within policy limits or the insured suffers consequential damages apart from an excess judgment. (See, e.g., *J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 13–14 [68 Cal.Rptr.2d 837] [insurer used insured's fear of punitive damages to coerce the insured to contribute to settlement]; *Bodenhamer v. Superior Court* (1987) 192 Cal.App.3d 1472, 1478–1479 [238 Cal.Rptr. 177] [delayed settlement damaged insured's business goodwill]; *Barney v. Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966, 978 [230 Cal.Rptr. 215] [insurer settled claim without insured's consent]; *Larraburu Brothers, supra,* 604 F.2d at p. 1215 [delayed settlement damaged insured's credit].)

Matters are complicated here by the fact that American was one of many insurers on the risk, not a single insurer. Nevertheless, the essential elements remain the same and the insured had to establish liability and damages for American's failure to settle. Liability was established by evidence that American (and other insurers) rejected a reasonable settlement offer of $1.85 million when the ultimate judgment was likely to (and did) exceed the amount of the offer. (*Johansen, supra,* 15 Cal.3d at p. 16.) As noted above, when one of multiple insurance policies provides coverage, each insurer's obligation is to cover the full extent of the insured's liability up to policy limits. (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.,*

*supra,* 45 Cal.App.4th at p. 106.) American did not respond to the settlement demand with its policy limits and, had it and other insurers done so, could have settled the litigation.

Damages were established by evidence that the insured Bishop suffered consequential damages, even if we accept American's position that all available insurance policies must be considered and that there was no excess judgment because the James Howard compensatory damages component of the judgment ($2.5 million out of $11.25 million) did not exceed the amount of the Bishop's aggregate policy limits of $4.3 million. As the trial court found, the Bishop was exposed to dire financial circumstances as a direct result of American's failure to defend, indemnify, or settle James Howard's claim. Although the amount of compensatory damages awarded to James Howard did not exceed the amount of the Bishop's aggregate policy limits, the fact is that the insurers (including American) did not step forward to pay those damages or to settle with James Howard. On paper, the Bishop had aggregate policy limits of $4.3 million. But coverage under those policies was disputed. Even those insurers that defended the Bishop did so under a reservation of rights to deny coverage and refuse indemnification. The Bishop did not have access to insurance funds for indemnification sufficient to satisfy the judgment. The Bishop was forced to reach his own settlement with the Howards in May 1999, while the case was on appeal. The Bishop suffered damages from American's misconduct, including payments the Bishop made to settle the case, and postjudgment attorney fee and accounting expenses incurred to protect his interests. The trial court properly found that American breached its duty to settle.

E. *American acted in bad faith*

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Rest.2d Contracts, § 205.) "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. [Citations.] The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) Breach of the covenant of good faith and fair dealing exposes an insurer to breach of contract and tort damages. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684 [254 Cal.Rptr. 211, 765 P.2d 373].) But "a breach of an insurance contract does not automatically subject an insurer to tort damages for bad faith . . . ." (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 194 [97 Cal.Rptr.3d 568].) An insurer's tortious "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself."

(*California Shoppers Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54 [221 Cal.Rptr. 171].) In simple terms, an insurer's tortious bad faith conduct is conduct that is unreasonable. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 12:52, 12:224, pp. 12A-19 to 12A-20, 12B-4 (rev. # 1, 2009).)

The trial court here determined that "American is liable for its bad faith failure to defend, settle, and indemnify the Bishop in the James Howard case," and assessed tort damages for all harm "suffered by the Bishop that were proximately caused by American's breach of the implied covenant of good faith and fair dealing." American argues that its conduct was not unreasonable, and thus not actionable as tortious bad faith. The record, however, shows substantial evidence of bad faith.

As noted above, the implied covenant of good faith and fair dealing "obligates the insurance company, among other things, to make reasonable efforts to settle a third party's lawsuit against the insured. If the insurer breaches the implied covenant by unreasonably refusing to settle the third party suit, the insured may sue the insurer in tort to recover damages proximately caused by the insurer's breach." (*PPG Industries, Inc. v. Transamerica Ins. Co., supra,* 20 Cal.4th at p. 312.) There is substantial evidence, described above, that American acted unreasonably in refusing to settle the James Howard lawsuit. American denies that conclusion and insists that it was guilty of no more than an honest mistake or bad judgment, which is not actionable bad faith.

"A number of cases suggest that some degree of insurer 'culpability' is required before an insurer's refusal to settle a third party claim can be found to constitute 'bad faith' . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:245, p. 12B-11 (rev. # 1, 2009).) It has been noted, however, that these cases address the reasonableness of the insurer's refusal to settle based on a dispute as to the *value* of the case, not a dispute as to *coverage*. (*Id.,* ¶ 12:246.1, p. 12B-11 (rev. # 1, 2009).) Although an insurer may reasonably underestimate the value of a case, and thus refuse settlement, an insurer does not act reasonably in using its no-coverage position to refuse settlement altogether. " 'An insurer who denies coverage *does so at its own risk and although its position may not have been entirely groundless*, if the denial is found to be wrongful [(i.e., erroneous)] it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract.' " (*Johansen, supra,* 15 Cal.3d at p. 15, original italics; see *id.* at fn. 4.)

Despite this well-established principle, American argues that its refusal to settle was prompted by a genuine dispute concerning coverage (whether the

molestation occurred within the policy period) and cites a case for the proposition that "where there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 [108 Cal.Rptr.2d 776], italics omitted (*Chateau*).) American's reliance on *Chateau* is misplaced.

*Chateau* was a first party insurance case, where the insured sought compensation for losses sustained directly by the insured. (*Chateau, supra,* 90 Cal.App.4th at p. 339.) We are here concerned with the distinct situation of a third party insurance case, where the insured Bishop was sued for losses sustained by a third party, James Howard. There are material differences in the purposes of first party insurance policies (that obligate the insurer to pay damages claimed by the insured itself) and third party insurance policies (that obligate the insurer to defend, settle, and pay damages claimed by a third party against the insured). (*McMillin Scripps North Partnership v. Royal Ins. Co.* (1993) 19 Cal.App.4th 1215, 1220–1221 [23 Cal.Rptr.2d 243].) A court must be mindful of these differences in determining the scope of the implied covenant of good faith and fair dealing and the obligations the covenant imposes on an insurer. (See *Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818 [the precise nature and extent of the duty imposed by the implied covenant of good faith and fair dealing depend on the contractual purposes]; see also *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704] [distinguishing first and third party insurance coverage].) Although the same implied covenant of good faith and fair dealing is involved in both first party and third party bad faith cases, the claims and settlement procedures "may differ significantly." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 12:800, p. 12C-1 (rev. # 1, 2009).)

*Chateau*'s genuine dispute rule does not apply in all bad faith insurance contexts. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 12:618 to 12:618.10, 12:621, pp. 12B-103 to 12B-105, 12B-106 (rev. # 1, 2009).) In first party cases, where payment is sought for the insured's direct losses, an insurer may raise a reasonable dispute over coverage without being guilty of bad faith. (*Chateau, supra,* 90 Cal.App.4th at p. 347.) But it has never been held that an insurer in a third party case may rely on a genuine dispute over coverage to refuse settlement. Instead, it is a long-standing rule that "the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." (*Johansen, supra,* 15 Cal.3d at p. 16.) "[A] belief that the policy does not provide coverage . . . should not affect a decision as to whether the settlement offer in

question is a reasonable one." (*Ibid.*; see Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:241, p. 12B-9 (rev. # 1, 2009) [coverage defenses irrelevant to insurer's settlement decision].)

Even if the genuine dispute standard were applied here, American's refusal to settle cannot be excused as a reasonable dispute. American's no-coverage position was founded on an unfair and selective reading of James Howard's deposition testimony that distorted James's account of specific episodes of molestation into an admission that no molestation occurred during the policy period, and the insurer's refusal to settle ignored powerful indications that a multimillion-dollar judgment was likely. The trial court detailed these matters in its statement of decision and we will not repeat them here.

American also acted in bad faith in refusing to indemnify the Bishop after judgment was entered in the Howard case. In this context, an insurer's genuine dispute as to coverage may negate bad faith. (*Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 523 [46 Cal.Rptr.2d 845].) But "[a] genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 723 [68 Cal.Rptr.3d 746, 171 P.3d 1082], italics omitted.) "In the insurance bad faith context, a dispute is not 'legitimate' unless it is founded on a basis that is reasonable under all the circumstances." (*Id.* at p. 724, fn. 7.) American's refusal to indemnify the Bishop for the Howard judgment was not reasonable. The refusal to indemnify, like the refusal to settle, was based on an unfair and selective reading of James Howard's testimony—in this instance, James's trial testimony.

In denying indemnification posttrial, American argues that James's trial testimony placed the start of molestation in 1980, after expiration of American's insurance policy in 1979. We discussed the same coverage argument above. As we noted, the argument rests on James's response to a single question when he was asked at the 1998 trial, "When in time is your first memory of Oliver O'Grady violating you?," and James answered "It's probably five or six years old." James was five years old in June 1980, seven months after the American policy expired. American did not reasonably rely upon this testimony to deny indemnification. As explained earlier, James testified about his "first memory" of molestation, not the first actual incident of molestation; vaguely said he was "probably" five or six years old; and gave his testimony in a context where the exact time that the molestation started was immaterial. The trial testimony was far too uncertain to constitute a reasonable basis for the denial of indemnification. Substantial evidence supports the trial court's conclusion that American acted in bad faith.

## F. *Bad faith damages were properly calculated*

In assessing bad faith damages, the court found that the Bishop was entitled to recover payments made by the Bishop to settle the James Howard case, and to recover payments made to attorneys and accountants to protect the Bishop's assets after judgment was rendered. American contends that the trial court's assessment of bad faith damages was incorrect.

American first argues that the court erred in awarding the Bishop the entire amount he paid to settle the James Howard case, $1,533,698, because all or most of that amount went to punitive damages, which are not insurable. American reasons as follows: (1) the Bishop's settlement "payment was for the judgment"; (2) the compensatory damages component of the judgment was largely paid by insurers CIGNA and St. Paul; (3) the Bishop's payment must necessarily be allocated to the remaining punitive damages component of the judgment; (4) punitive damages are not insurable; and (5) the Bishop may not recover his settlement payment because it was for punitive damages. This argument was presented to the trial court and rightly rejected. The argument's flaw lies in the first premise.

The Bishop's settlement payment was not in satisfaction of the judgment. At the time of the settlement, the judgment was on appeal and the Howards were asserting rights to compensatory damages beyond those awarded in the underlying action. The settlement thus went beyond the judgment and encompassed all claims the Howards made, or could make, concerning the Bishop's retention of a molesting priest. The agreement, by its terms, settled "all claims of Joh Howard and James Howard against the Bishop arising out of or connected with the allegations of Joh Howard and James Howard, *including but not limited to*, those causes of action and theories of liability alleged by Joh Howard and James Howard" in the underlying cases. (Italics added.) The Bishop's payment was made "to compensate plaintiffs for their physical injuries and sickness caused by the events underlying" the wrongful retention cases—not to pay the judgment itself.

American argues that if the settlement payment did not go to the judgment, then the payment was not proximately caused by the insurer's bad faith and thus was not recoverable as damages. We disagree. The settlement was necessitated by American's failure to settle and indemnify. We also reject American's argument that the settlement agreement improperly shifted punitive damages to the insurer. American is right, of course, that "an insured may not shift to its insurance company, and ultimately to the public, the payment of punitive damages awarded in the third party lawsuit against the insured as a result of the insured's intentional, morally blameworthy behavior against the third party." (*PPG Industries, Inc. v. Transamerica Ins. Co., supra*, 20

Cal.4th at p. 319.) But the trial court here found no evidence that "the settlement payment was unreasonable or the product of fraud or collusion," and American has not demonstrated otherwise. Absent evidence of fraud or collusion, we will not set aside a settlement agreement negotiated between an insured and injured parties and recharacterize the sums paid under their agreement.

As a second point on bad faith damages, American argues that fees incurred postjudgment in hiring an attorney to obtain an appeal bond, explore bankruptcy, and negotiate with the Howards and insurers were wrongly awarded as costs of mitigation rather than as costs to compel payment of benefits under the insurance policy (*Brandt* fees). (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*).) As either type of cost is recoverable, it is not clear what American hopes to accomplish by recharacterizing the award. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 13:72.5, 13:120, pp. 13-18, 13-32.1 (rev. # 1, 2009).) In any event, the trial court properly characterized the attorney fees as costs incurred to mitigate the damages caused by American's failure to defend, settle, and indemnify, and properly ordered reimbursement.

### G. Brandt *fees were properly awarded*

 If "an insurer denies coverage in bad faith, the insured can recover attorney fees in an action to recover the policy benefits." (*Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1257 [45 Cal.Rptr.3d 362, 137 P.3d 192], citing *Brandt, supra,* 37 Cal.3d at p. 817.) An insurer's tortious breach of the implied covenant of good faith and fair dealing makes the insurer liable for all damages that are a proximate result of that breach. (*Brandt, supra,* 37 Cal.3d at p. 817.) Thus, "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss— damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action. [¶] 'When a pedestrian is struck by a car, he goes to a physician for treatment of his injuries, and the motorist, if liable in tort, must pay the pedestrian's medical fees. Similarly, in the present case, an insurance company's refusal to pay benefits has required the insured to seek the services of an attorney to obtain those benefits, and the insurer, because its conduct was tortious, should pay the insured's legal fees.' " (*Ibid.*)

■ However, the fees recoverable "may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Brandt, supra*, 37 Cal.3d at p. 819.) In short, the plaintiff is entitled to legal fees attributable to the contract recovery but not fees attributable to the tort recovery. (*Ibid.*) Of course, contract and tort issues are often intertwined. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 811 [16 Cal.Rptr.3d 374, 94 P.3d 513] (*Cassim*).) Apportionment of fees between contract and tort issues may be further complicated where a plaintiff agrees to compensate his or her attorney on a contingency basis, as a percentage of the entire award. (*Id.* at pp. 807–813.) The California Supreme Court has addressed this situation and developed a method for calculating *Brandt* fees in a contingent fee context. (*Cassim*, at pp. 811–812.) "This method requires the trier of fact to determine the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery. . . . [¶] To determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort. This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Ibid.*)

The trial court here employed the *Cassim* method and, after a comprehensive review of detailed time records, concluded that 57.44 percent of the attorneys' time was attributable to contract claims. (*Cassim, supra*, 33 Cal.4th at pp. 811–812.) The contingent fee agreement promised 50 percent of the total recovery to the attorneys for their legal work on the case, and thus the court concluded that plaintiffs are entitled to 28.72 percent of all damages as *Brandt* fees. The amount was calculated as $661,719.97.

On appeal, American argues that the court erred in multiplying the fee percentage against all damages, including the $500,000 awarded to James as a judgment creditor and the $75,523.87 in defense costs awarded to plaintiffs as assignees of CIGNA and St. Paul. American maintains that these two items were not attributable to the Bishop's recovery on the insurance policy. However, American fails to provide any meaningful analysis of the court's calculation. American simply asserts its claim of error in two sentences in its opening appellate brief without any citation to the record. It is not our place to comb the record seeking support for assertions parties fail to substantiate. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 354 [86 Cal.Rptr.3d 383].)

The court's statement of decision, on its face, shows that the court arrived at the fee percentage *after* excluding time spent on matters unrelated to contract recovery. The court may have excluded time spent on the judgment creditor and assignment claims, which American claims are not contract related. American has provided no basis for us to conclude otherwise. Its argument that the court erred in multiplying the fee percentage against all damages, when some were not contract related, misapprehends the calculations required by *Cassim*. Under *Cassim, supra*, 33 Cal.4th 780, the court excludes non-contract-related legal work at the outset—when calculating the fee percentage. American has not shown that the fee percentage was in error and that plaintiffs' attorneys did not spend 57.44 percent of their time pursuing contract claims. American has thus failed to demonstrate that the court improperly awarded fees for legal work done to recover payment outside the insurance contract.

## H. *Prejudgment interest*

We now reach plaintiffs' cross-appeal challenging the trial court's refusal to award prejudgment interest. We conclude that plaintiffs are entitled to interest and modify the judgment to award interest.

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." (Civ. Code, § 3287, subd. (a); hereafter section 3287(a).) "[O]ne purpose of section 3287[(a)], and of prejudgment interest in general, is to provide just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury." (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663 [25 Cal.Rptr.2d 109, 863 P.2d 179].) Under section 3287(a), "the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim." (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 [76 Cal.Rptr.2d 743].) Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated. (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907 [197 Cal.Rptr. 348] (*Chesapeake Industries*).) The test for determining certainty under section 3287(a) is whether the defendant knew the amount of damages owed to the claimant or could have computed that amount from reasonably available information. (*Chesapeake Industries*, at p. 907.) Uncertainty as to *liability* is irrelevant. "A dispute concerning liability does not preclude prejudgment interest in a civil action." (*Boehm & Associates v. Workers' Comp. Appeals Bd.* (1999) 76 Cal.App.4th 513, 517 [90 Cal.Rptr.2d 486].) The certainty required by section 3287(a) is not lost when the existence of

liability turns on disputed facts but only when the amount of damages turns on disputed facts. (*Olson v. Cory* (1983) 35 Cal.3d 390, 402 [197 Cal.Rptr. 843, 673 P.2d 720].) Moreover, only the claimant's damages themselves must be certain. Damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by the defendant. (*Chesapeake Industries, supra,* at p. 907.)

Plaintiffs here seek prejudgment interest on two components of damages awarded by the court: (1) the $500,000 due on the underlying judgment of July 1998 awarded to plaintiff James Howard as a judgment creditor; and (2) the $1,533,698 payment made by the Bishop to settle the James Howard case in May 1999. The trial court denied the request for prejudgment interest with little explanation. The court simply said that "American's liability was not liquidated and certain." As plaintiffs rightly note, it is the amount of damages, not liability, that must be liquidated and certain. The trial court erred in denying prejudgment interest.

Plaintiffs are entitled to prejudgment interest on the $500,000 policy limit owed by American to indemnify the Bishop for the James Howard judgment entered in July 1998, and awarded to James Howard as a judgment creditor. (See *California Shoppers Inc. v. Royal Globe Ins. Co., supra,* 175 Cal.App.3d at pp. 34–35 [awarding prejudgment interest on damages for insurers' breach of duty to indemnify].) James received a fixed and certain judgment of $2.5 million in compensatory damages. Assuming coverage under the policy was established, as it ultimately was, American had a duty to indemnify the Bishop on the judgment, and to pay James as a judgment creditor, up to the insurer's $500,000 policy limit. Liability was uncertain but the $500,000 policy limit was a sum certain. American does not dispute these principles.

However, American argues that the amount due the Bishop or James was uncertain because two insurers, CIGNA and St. Paul, made payments toward partial satisfaction of the judgment. American notes that the parties disagreed at trial as to whether the two insurers' settlement payments constituted offsets that reduced the amount owed on American's policy, and maintains that this dispute prevented certainty in the amount owed. But, as stated above, damages are not made uncertain by the existence of unliquidated counterclaims or offsets interposed by a defendant. (*Chesapeake Industries, supra,* 149 Cal.App.3d at p. 907.) American suggests that partial satisfaction of judgment is something distinct from a standard counterclaim or offset but does little to advance that argument. Even if we accept American's argument, the fact remains that the amounts CIGNA and St. Paul paid in partial satisfaction of the judgment did not significantly reduce the judgment, and

thus did not render uncertain American's obligation to pay its $500,000 policy limit. James and Joh Howard received a judgment awarding compensatory damages of $5.25 million. In May 1999, the Bishop settled the underlying litigation while it was on appeal and St. Paul and CIGNA contributed to that settlement. St. Paul paid $2,339,000, and CIGNA paid $956,342.12. A total offset of these payments against the judgment would leave almost $2 million unpaid on the Howard judgment, of which James Howard was due roughly half. Thus, under any scenario, the judgment remained far in excess of American's policy limit of $500,000. The possibility of offsets did not make the amount of American's debt uncertain. Prejudgment interest was due under section 3287(a).

Even if interest was not due under section 3287(a), it was due under the terms of the insurance policy. American's supplementary payment provision (SPP) states: "The company will pay, in addition to the applicable limits of liability [¶] . . . [¶] all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon . . . ." American was obligated to pay interest accruing from the time of judgment. (*State Farm General Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 289 [95 Cal.Rptr.3d 845]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 7:160, 7:160.8, 13:57, pp. 7A-74, 7A-76.1, 13-12 (rev. # 1, 2009).)

Plaintiffs are also entitled to interest on the $1,533,698 payment made by the Bishop to settle the James Howard case in May 1999. (§ 3287(a).) American disputes this conclusion. American argues that damages awarded for insurance bad faith are inherently uncertain because they necessarily involve a resolution of conflicting facts, and insists that no case has ever awarded prejudgment interest on bad faith damages. American is mistaken. "Prejudgment interest may . . . be recoverable in insurance litigation in certain tort cases." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 13:171, p. 13-49 (rev. # 1, 2009).) "Whether prejudgment *interest is awardable as a matter of right . . . depends on whether the amount due under the policy is sufficiently 'certain' . . . .*" (*Id.*, ¶ 13:31, p. 13-8 (rev. # 1, 2009).) The Ninth Circuit, applying California law, affirmed an award of prejudgment interest where the primary insurer breached the covenant of good faith and fair dealing in failing to settle and an excess judgment resulted. (*Highland Ins. Co. v. Continental Casualty Co.* (9th Cir. 1995) 64 F.3d 514, 521–522.) The federal court held that an excess insurer was entitled to prejudgment interest under section 3287(a) on its postjudgment

settlement payment. (*Highland Ins.*, at pp. 516–518, 521–522.) Although bad faith insurance cases commonly involve disputed issues of fact as to liability, damages may be certain and prejudgment interest therefore proper. (*Highland Ins. Co., supra*, 64 F.3d at p. 521.) Here, there was no dispute concerning how much the Bishop paid to settle with the Howards. The sum was certain, and thus prejudgment interest was due.

Plaintiffs ask that we modify the judgment to award prejudgment interest of $1,431,478.73, pursuant to a series of calculations they set out in their briefs on appeal. American disputes the accrual date and rate of interest and maintains that any award of prejudgment interest requires remand to the trial court to determine when the money owed became certain, and the applicable rate of interest. But the accrual date is certain. Plaintiffs are entitled to interest on $500,000 due on the underlying judgment from the date the final judgment was issued in July 1998, and entitled to interest on the $1,533,698 payment made by the Bishop from the date of settlement in May 1999.

The rate of interest is also clear. The parties agree that a 7 percent rate of interest applies to the $1,533,698 settlement payment by the Bishop, which plaintiffs calculate (without dispute by American) as interest of $947,978.73. The rate of interest for breach of contract (unless specified by the contract itself) is 7 percent on contracts entered into on or before January 1, 1986, and 10 percent on contracts entered into after January 1, 1986. (Cal. Const., art. XV, § 1; Civ. Code, § 3289, subd. (b); *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585–1586 [36 Cal.Rptr.2d 343].) The contract here—the insurance policy—was entered into in 1978 and thus the 7 percent rate of interest applies.

American argues that a 7 percent contract rate of interest also applies to the $500,000 judgment creditor award, whereas plaintiffs put the rate at 10 percent as interest accruing on a judgment. Plaintiffs are correct. The contract "rate applies until the contract is superseded by a judgment." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 13:59, p. 13-13 (rev. # 1, 2009); see Civ. Code, § 3289, subd. (a) [contract rate applies "until the contract is superseded by a verdict or other new obligation"].) Postjudgment interest accrues at the rate of 10 percent. (Code Civ. Proc., § 685.010, subd. (a).) Plaintiffs calculate the interest due on the $500,000 payment toward the underlying judgment as $483,500. American does not challenge

this mathematical computation. The total prejudgment interest due is, as plaintiffs state, $1,431,478.73. We modify the judgment to award that amount.

## I. Costs

The trial court awarded plaintiffs costs of suit in the amount of $93,827.07. (Code Civ. Proc., § 1032, subd. (b).) American does not deny that prevailing parties are entitled to recover costs but contests various items allowed as costs. American claims the court erred in awarding (1) private judge fees; (2) deposition costs; (3) expert fees; and (4) attorney meal expenses. We address these claims in turn.

### 1. Private judge fees

The parties agreed to resolve the insurance litigation by means of a bench trial presided over by Justice Stone of JAMS, who was appointed as a judge pro tem. In April 2005, the parties filed a stipulation with the court agreeing to the appointment of Justice Stone and further stipulating "that the parties shall divide the fees of the Judge Pro Tem as follows: plaintiffs—50% and American National Fire Insurance Company/Great American Insurance Companies—50%." The parties also executed an agreement sometime around May 2005 detailing the terms of the appointment.[7] The agreement provides: "The Parties agree that the expedited trial will be presided over by Justice Steven Stone, or another judge or judges (either sitting or pro tem) upon whom the Parties agree, one-half of the cost to be borne by Plaintiffs, one-half by American."

After prevailing at trial, plaintiffs filed a memorandum of costs that sought $46,542.32 for the JAMS fees they incurred in paying for Justice Stone's services. American filed a motion to tax costs in which it objected to an award of JAMS fees. American argued that the parties expressly "agreed to split the cost of the J.A.M.S. judge equally." Plaintiffs responded that JAMS fees are a recoverable cost without directly addressing the specific terms of the parties' agreement. The trial court denied American's motion to tax costs.

American renews its objection to the award of JAMS fees. Plaintiffs argue, as they did in the trial court, that private judge fees are a recoverable cost of litigation. Plaintiffs give short shrift to the actual terms of the parties'

---

[7] The copy of the agreement provided in the record on appeal is not fully executed but its authenticity is not questioned.

agreement. Plaintiffs say that "[i]t is not unusual for parties to agree to advance the cost or expense of a legal procedure or item that is necessary to conduct litigation between them. However, barring an express waiver, such an agreement does not bar a *discretionary* recovery of the winning party's initial share from the losing party." (Original italics.) Plaintiffs also say that "JAMS required the parties to pay up front for its ADR services. American agreed to share the cost of advancing the necessary JAMS fees. Those fees became an item of costs claimable by the prevailing party in the trial court's discretion." The argument is an act of obfuscation. Plaintiffs' supposition that the parties agreed to "advance the cost" of a private judge in equal proportions is untrue. No fair reading of the parties' agreement supports that claim.

The parties stipulated "that the parties shall divide the fees of the Judge Pro Tem as follows: plaintiffs—50% and American National Fire Insurance Company/Great American Insurance Companies—50%." The parties further stated "that the expedited trial will be presided over by Justice Steven Stone, . . . one-half of the cost to be borne by Plaintiffs, one-half by American." The agreement does *not* say that the fees will be advanced equally, but that the fees will be "divide[d]" and "borne" equally. The plain meaning of the parties' agreement is inescapable: the parties agreed to split the cost of the JAMS judge equally. The trial court erred in awarding JAMS fees to plaintiffs.

### 2. *Deposition costs*

Plaintiffs were awarded $44,588.78 to reimburse the cost of deposing 21 individuals. (Code Civ. Proc., § 1033.5, subd. (a)(3).) American contends, as it did in the trial court, that the costs should have been allocated between itself and another defendant insurer which, at the time of the cost bill, was awaiting trial on damages.[8] We reject the contention. A prevailing party is entitled to all costs reasonably necessary to the conduct of the litigation. (Code Civ. Proc., § 1033.5, subd. (c)(2).) American never demonstrated that the deposition costs were unnecessary to the conduct of litigation against it, and necessary only for the litigation against a codefendant insurer. In fact, American concedes that the "depositions involved Plaintiffs' claims against American" but argues that an allocation should be made because the depositions also impacted other defendants. American provides no authority for its assertion that a court must allocate a prevailing plaintiff's costs among a codefendant adjudged liable, and another codefendant for whom litigation remains pending (and may never be adjudged liable and subject to costs

---

[8] American's request to take judicial notice of a court document setting forth the status of the litigation against the codefendant is granted. (Evid. Code, § 452, subd. (c).)

recovery).[9] Allocation may have been appropriate if American had demonstrated that the issues involved in the depositions were separable between the defendants. This American did not do. We therefore conclude that the trial court did not abuse its discretion in finding the deposition costs reasonably necessary to the conduct of the litigation against American and ordering American to pay those costs.

### 3. Expert fees

Plaintiffs sought costs totaling $103,227.07, of which $9,400 was attributable to expert witness fees. American objected to the fees, noting that fees are recoverable only for court-appointed experts. (Code Civ. Proc., § 1033.5, subd. (b)(1).) The court generally denied American's objections to plaintiffs' cost memorandum but made the denial "subject to the following reduction." The court reduced plaintiffs' cost request by $9,400, awarding $93,827.07. Although it is better practice to specify the items of costs that are denied, it is sufficiently clear on this record that the court denied plaintiffs' request for $9,400 in expert witness fees. American's argument that expert fees are not recoverable is therefore moot. No expert fees were awarded.

### 4. Attorney meal expenses

Finally, American argues that the court erred in awarding plaintiffs $2,368 in attorney meal expenses incurred while traveling to take depositions. The expense of taking depositions—including travel expenses incurred by out-of-town counsel to attend depositions—is an allowable cost. (Code Civ. Proc., § 1033.5, subd. (a)(3); *Thon v. Thompson* (1994) 29 Cal.App.4th 1546, 1549 [35 Cal.Rptr.2d 346].) American argues that meal expenses are never allowed, and relies upon a case disallowing meal expenses incurred by local attorneys taking local depositions. (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774–775 [23 Cal.Rptr.2d 810].) We do not understand *Ladas* to establish an absolute rule prohibiting reimbursement for attorney meal expenses under any and all circumstances. (See *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 72 [100 Cal.Rptr.3d 152] [distinguishing local meal expenses from meal expenses incurred while traveling].) The trial court is vested with broad discretion in determining if an expense is "reasonably necessary to the conduct of the litigation." (Code Civ. Proc., § 1033.5, subd. (c)(2).) Although the incurring of meal expenses may be merely convenient to an attorney attending a local deposition, meal expenses may be reasonably necessary where an out-of-state attorney must travel to the deposition. We cannot say that the court abused its discretion here in awarding costs—including meal expenses—incurred by attorneys traveling to take depositions.

---

[9] Ultimately, this is what transpired here as the codefendant insurer settled with plaintiffs.

## III. DISPOSITION

The judgment is modified to award plaintiffs prejudgment interest of $1,431,478.73 but is otherwise affirmed. Plaintiffs' postjudgment cost award is modified to strike $46,542.32 awarded in private judge fees but is otherwise affirmed. Plaintiffs shall recover costs incurred on the appeal and cross-appeal in case No. A121569, upon timely application in the trial court. (Cal. Rules of Court, rule 8.278(c)(1).) The parties shall bear their own costs incurred in case No. A123187.

Ruvolo, P. J., and Rivera, J., concurred.

A petition for a rehearing was denied September 9, 2010, and the opinion was modified to read as printed above. The petition of appellant American National Fire Insurance Company for review by the Supreme Court was denied November 23, 2010, S186504. Corrigan, J., did not participate therein.