760 S.E.2d 590

STATE of West Virginia ex rel.
OWNERS INSURANCE
COMPANY, Petitioner

v.

Honorable Warren R. McGRAW, Judge of
the Circuit Court of Wyoming County,
West Virginia, and Morlan Enterprises,
Inc., Respondents.

No. 13–1153.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 19, 2014.

Decided June 18, 2014.

Barbara J. Keefer, Esq., Karen E. Klein, Esq., Schuda & Associates, PLLC, Charleston, WV, for the Petitioner.

Brent K. Kesner, Esq., Ernest G. Hentschel, Esq., Kesner & Kesner, PLLC, Charleston, WV, for the Respondent.

PER CURIAM:

Petitioner Owners Insurance Company ("Owners") invokes the original jurisdiction of this Court seeking a writ of prohibition to stop the Circuit Court of Wyoming County from exercising jurisdiction over it, from applying West Virginia substantive law instead of Ohio law to an insurance coverage issue, from allowing the respondent, Morlan Enterprises, Inc. ("Morlan") to proceed against it on a first-party bad faith claim and for violation of the West Virginia Unfair Trade Practice Act ("UTPA"), W. Va.Code § 33–11–1, et seq., (1974), and from prohibiting the presentation of evidence of the payment of attorney fees sought by Morlan that were paid by another source. Upon a thorough review of the briefs, arguments of counsel, the designated record and applicable precedent, we find that the petitioner has not established the necessary elements for the granting of a writ, and we therefore deny the requested writ of prohibition.

I.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a September 15, 2005, incident where electrician Bobby Messer came into contact with an energized electrical transmission line while working as a lineman for Rectron, Inc., in Mingo County. Mr. Messer alleged that his supervisors tested the line, confirmed that it was de-energized, grounded it and instructed him to remove the transformers and switches from the pole. At the time of the accident, Mr. Messer was working on a line between a substation and a cellphone tower. Mr. Messer's injuries required the amputation of his left arm and right leg.

Mr. Messer filed a civil action against his employer and other entities. Through a series of amended complaints, Mr. Messer added claims against respondent Morlan who had contracted with Rectron, Inc. for services, and against Paul Kerns, an electrician who worked as a subcontractor for Morlan. Mr. Kerns, an Ohio resident, was covered under a commercial general liability policy issued by Owners. This policy was obtained in Ohio through an Ohio agent. Owners likewise operates in the State of Ohio. Mr. Messer and his wife ultimately settled his claims with the various corporate entities,

with the exception of Hampden Coal Company, LLC.[1]

The commercial general liability policy issued by Owners was obtained by Mr. Kerns through Gladstone Insurance Agency as part of his work for Morlan. On March 2, 2005, Mr. Kerns' insurance agent faxed to Morlan at its headquarters in Parkersburg a "Certificate of Insurance Coverage" dated March 2005. This certificate of insurance identified a policy of insurance in effect from October 9, 2004, through October 9, 2005. Owners was listed as the insurer providing this coverage, and Morlan was named along with Mr. Kerns on the certificate as an additional insured.

After Mr. Messer's lawsuit was filed against Morlan and the other defendants, Morlan's insurer, Westfield Insurance Company ("Westfield"), put Owners on notice of a potential claim against the commercial general liability policy on which Morlan was listed as an additional insured. Owners took no action to defend Morlan until after Morlan filed a third-party complaint against Mr. Kerns, wherein Morlan asserted that any liability it had to Mr. Messer was the result of work performed by Mr. Kerns in April and May of 2005. Owners then engaged counsel to defend Mr. Kerns for the third-party claim. Mr. Messer eventually also asserted a direct claim against Kerns and Owners provided a defense to that claim. In April of 2009, Owners settled Mr. Messer's claim against Morlan and Kerns and obtained a full and final release of liability. The settlement of Mr. Messer's claim did not, however, resolve the coverage dispute between Morlan and Owners.

While these coverage claims were pending in West Virginia, Owners twice filed declaratory actions in Ohio courts, seeking a declaratory judgment of its duties to Morlan. The first of these actions was filed in the Court of Common Pleas in Guernsey County. That case was dismissed; the Ohio judge ruling that the matters at issue belonged in the courts of West Virginia.[2]

The second action was filed in the Court of Common Pleas in Allen County, Ohio, seeking a declaratory judgment of Owners' duties toward Morlan. On November 5, 2009, this case was also dismissed; the court finding that "Ohio has no overriding interest in deciding this case. It does not involve a localized controversy. It is a broad action for contribution based on a settlement paid in West Virginia based on claims originating in West Virginia and involves policies issued and witnesses residing in West Virginia." The Allen County court specifically noted that "many of the same issues could be covered" in the litigation pending in West Virginia.

Owners appealed the Allen County decision to the Ohio Court of Appeals. The Ohio Court of Appeals affirmed the Allen County ruling by an opinion entered April 5, 2010, stating that West Virginia had far superior contacts with the case than Ohio did, because the coverage issues arose from an incident in West Virginia, West Virginia was the state where all of the transactions of direct relevance to Owners' complaint took place and West Virginia was the site where Owners negotiated the settlement with Mr. Messer and his wife for which it now sought indemnification.

After its Ohio appeals were exhausted, Owners filed an action in the Circuit Court of Wyoming County separate from the one filed by Mr. Messer seeking to recover the amounts it paid to settle the Messer claims against Morlan from Morlan's commercial, Westfield. This civil action was consolidated with the original civil action filed by Mr. Messer in 2006 for the purposes of discovery.

---

1. The underlying case in which Mr. Messer sued Hampden Coal Company, LLC, and other entities was appealed to this Court on a juror disqualification issue. The pertinent facts regarding the workplace accident giving rise to the present case are derived from that opinion. The claims against Hampden Coal Company, LLC, were tried, and the jury returned a verdict in favor of company. Mr. Messer appealed that verdict to this Court. The verdict was affirmed by this Court in *Messer v. Hampden Coal Company, LLC*, 229 W.Va. 97, 727 S.E.2d 443 (2012).

2. In its order entered June 15, 2009, the Ohio court stated that the "Plaintiff may pursue adjudication of this matter in the Circuit Court of Wyoming County, West Virginia, in Civil Action No. 08–C–182."

On May 24, 2011, Owners filed a motion to apply Ohio law to this dispute. That motion was later amended to include a motion for summary judgment on that issue. Morlan disputed Owners' motion, arguing that West Virginia law applied to this dispute because the certificate of insurance issued by Owners to Morlan was issued to Morlan's West Virginia address and that the incident giving rise to this dispute happened in West Virginia, making West Virginia law the governing law.

On June 11, 2013, the Circuit Court of Wyoming County denied Owners' Motion to apply Ohio law. Furthermore, in a November 4, 2013, order the court granted Morlan's motion to prohibit any evidence or testimony about the payment of legal fees by Westfield on behalf of attorneys representing Morlan in this action. The circuit court also granted Morlan's motion for summary judgment on the coverage issue, stating that Owners' commercial general liability policy provided primary coverage for Mr. Messer's claims against Morlan. The order did not address Morlan's claims against Owners for bad faith, breach of contract and violations of the UTPA.

Owners invokes the original jurisdiction of this Court, seeking a writ of prohibition to stop the current proceedings filed by Morlan in the Circuit Court of Wyoming County.

## II.

### STANDARD OF REVIEW

■ This Court has explained the standard of review applicable to a writ of prohibition, stating that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. W. Va.Code 53–1–1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977). In Syllabus pt. 4 of *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996), this Court said:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

## III.

### DISCUSSION

■ In this proceeding the petitioner seeks to prevent enforcement of the circuit court's order regarding its jurisdiction over Owners, the use of West Virginia substantive law over Ohio substantive law, allowing the first-party bad faith action instituted by Morlan to proceed against Owners and prohibiting Owners from introducing evidence of the payment of Morlan's attorney fees by another source.

The petitioner asserts there are four reasons why this Court should stop the proceedings pending in the Circuit Court of Wyoming County from going forward. Owners first asserts that the circuit court erred in ruling that West Virginia has jurisdiction over it since it is an Ohio-based insurer who issued a policy to an Ohio insured through an Ohio agent for a business located in Ohio that was not licensed to do business in West Virginia. Second, Owners asserts that West Virginia law should not apply to a question of coverage of an Ohio insurance policy issued to an Ohio insured by an Ohio insurer via an Ohio agent. Third, Owners contends that the named insured set forth on the certificate

of insurance was never an actual additional insured for which coverage was available. Fourth, Owners argues that the collateral source rule applies to the attorney fees paid by Morlan's own insurer in a coverage dispute regarding the priority of coverages between Westfield and Owners. Morlan counters that the lower court's rulings are correct and interlocutory and that Owners is not entitled to the relief of this Court in the form of a writ of prohibition.

We have held that an extraordinary writ, such as the one sought by Owners, is not to be used as a substitute for an appeal.[3] "Prohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syl. pt. 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953). In addition, "[t]his Court is 'restrictive in its use of prohibition as a remedy.' *State ex rel. West Virginia Fire Cas. Co. v. Karl*, 199 W.Va. 678, 683, 487 S.E.2d 336, 341 (1997)." *State ex rel. Allstate Ins. Co. v. Gaughan*, 220 W.Va. 113, 118, 640 S.E.2d 176, 182 (2006). In syllabus point 4 of *State ex rel. Hoover v. Berger*, this Court said:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important

problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Applying this standard of review, we find that Owners is not entitled to its requested writ of prohibition. Under the first prong of syllabus point 4 of *Hoover*, the Court must examine whether the party seeking the writ has any other adequate means, including a direct appeal, to obtain the desired relief. We find that inasmuch as the order of the circuit court is not a final order, Owners would have an opportunity to appeal the decision of the lower court upon entry of a final order.

Applying the second *Hoover* factor regarding whether Owners will be prejudiced in a way that is not correctable upon appeal, we see no indication that any error in the lower court's interlocutory rulings would not be reparable if this matter were directly appealed to this Court. Under prong two of *Hoover*, Owners is not prejudiced by waiting to appeal a final order.

The third and most significant factor is whether the circuit court's order is clearly erroneous as a matter of law. We have defined "clearly erroneous" as follows:

> A finding is "clearly erroneous" when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirely.

Syl. pt. 1, in part, *In the interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). Owners makes a number of argu-

---

**3.** "Under W. Va.Code 58–5–1 (1925) appeals may only be taken from final decisions of a circuit court. A case is final only when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution of what has been determined." Syl. pt. 3, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995).

ments regarding the propriety of the lower court's rulings, including that the circuit court's decision was clearly wrong because West Virginia has no jurisdiction over an Ohio insurer, who issued a policy to cover an Ohio resident at the request and behest of an Ohio insurance agent. Owners further argues that Morlan is not a first-party claimant who is entitled to pursue a bad faith/UTPA agreement against Owners. Morlan counters all of these arguments, relying upon the issuance of the certificate of insurance naming it an additional named insured to its West Virginia address.[4] The issuance of the certificate of insurance naming a West Virginia company as an additional insured is also support for Morlan's argument that West Virginia law, not Ohio law, should apply to this case. Finally, Morlan contends that the certificate of insurance establishes the basis of its bad faith/UTPA claim against Owners.

The circuit court's rulings were not clearly erroneous within our definition of the phrase. While there were arguments that supported both Owners' motion and Morlan's response, the circuit court's resolution of these issues does not leave this Court with a definite and firm conviction that the lower court made a mistake, such that this matter cannot proceed to a resolution before the circuit court and then be part of an appeal by one of the parties. These issues may be further developed in the circuit court and subsequently appealed.

Applying the fourth *Hoover* factor, i.e., whether the circuit court's order is an often-repeated error or that it manifests persistent disregard for established procedure or substantive law, we find that the circuit court's order does not display this type of persistent error or blatant disregard for our jurisprudence and procedure. Furthermore, the circuit court's order does not raise new or important problems or issues of law of first impression. Owners argues that this case presents an opportunity to clarify our holding in *Marlin* and to provide guidance to circuit courts on the issue and legal effect of certificates of insurance. We decline to address those questions in this proceeding prior to an appeal of the final order of the circuit court.

Reviewing the entirety of the record before us, we find that it is premature to issue the requested writ of prohibition based upon the interlocutory order herein. The matters raised by Owners in this petition should be resolved in the lower court. An appeal may then be taken from any final order.

## IV.

## CONCLUSION

For the foregoing reasons, we find and conclude that the petitioner is not entitled to a writ of prohibition.

Writ denied.

Chief Justice DAVIS, Justice LOUGHRY and Justice WORKMAN concur, and reserve the right to file concurring opinions.

Justice KETCHUM concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

DAVIS, Chief Justice, concurring:

In this case, the petitioner, Owners Insurance, filed a petition for a writ of prohibition seeking to challenge four rulings by the circuit court. The majority opinion has determined that the issues were not proper for resolution through an extraordinary writ. I concur in this determination. I have chosen to write separately to address issues raised in the concurring and dissenting opinion of my good friend and colleague, Justice Ketchum.

---

4. Both Owners and Morlan argues that our holding in *Marlin v. Wetzel County Board of Education*, 212 W.Va. 215, 569 S.E.2d 462 (2002), is applicable to the case at bar. We held in Syllabus point 9 of *Marlin* that

[a] certificate of insurance is evidence of insurance coverage, and is not a separate and distinct contract for insurance. However, because a certificate of insurance is an insurance company's written representation that a policyholder has certain insurance coverage in effect at the time the certificate is issued, the insurance company may be estopped from later denying the existence of that coverage when the policyholder or the recipient of a certificate has reasonably relied to their detriment upon a misrepresentation in the certificate.

At the outset, let me be perfectly clear in pointing out that the doctrine of equitable contribution has no application to Morlan's claim in this case. The dissent simply is legally wrong in arguing that Morlan does not have standing to recover its attorney's fees. As I will demonstrate below, the dissenting opinion has completely ignored the large body of law that actually governs Morlan's claim for attorney's fees.

To begin, the action against Owners was filed as a first-party bad faith action by Morlan. The damages sought by Morlan include the recovery of the attorney's fees its legal counsel charged in the underlying action. Owners is attempting to minimize its damages by offsetting the attorney's fees, because Westfield Insurance actually paid the fees on behalf of Morlan. As a general matter, we have held the following regarding the recovery of attorney's fees in a bad faith action:

> Where an insured is required to retain counsel to defend himself in litigation because his insurer has refused without valid justification to defend him, in violation of its insurance policy, the insured is entitled to recover from the insurer the expenses of litigation, including costs and reasonable attorney's fees.

Syl. pt. 1, *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986). The intent of *Aetna* is to allow an insured plaintiff to recover the costs of litigation when an insurer wrongfully refuses to provide coverage.

Owners' attempt to offset the attorney's fees paid on Morlan's behalf in the underlying litigation is precluded by the collateral source rule. This Court has described the collateral source rule as follows:

> The collateral source rule was established to prevent the defendant from taking advantage of payments received by the plaintiff as a result of his own contractual arrangements entirely independent of the defendant. Part of the rationale for this rule is that the party at fault should not be able to minimize his damages by offsetting payments received by the injured party through his own independent arrangements.

*Ratlief v. Yokum*, 167 W.Va. 779, 787, 280 S.E.2d 584, 590 (1981). We have held that "[t]he purpose of the collateral source doctrine is to prevent reduction in the damage liability of defendants simply because the victim had the good fortune to be insured or have other means of compensation." *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 447, 307 S.E.2d 603, 615 (1983). In tort actions similar to the instant case, courts have applied the collateral source rule to prevent a defendant from offsetting attorney's fees paid on behalf of a plaintiff by an insurance company.

For example, in *Graco, Inc. v. CRC, Inc. of Texas*, 47 S.W.3d 742 (Tex.App.2001), a plaintiff was injured by a hydraulic ram machine. The plaintiff filed a products liability action against the machine manufacturer, Graco, Inc., and the seller of the machine, CRC, Inc. Thereafter, CRC filed a cross-claim for indemnity against Graco. After the plaintiff's underlying claim was settled, CRC's insurer, State Farm, intervened in the cross-claim. State Farm sought to recover $107,859.82 that it incurred in attorney's fees and expenses on behalf of CRC in the underlying action. Graco moved to strike State Farm's intervention. The trial court's final judgment awarded CRC $107,859.82 for attorney's fees and expenses incurred in the underlying action, and granted Graco's motion to strike State Farm's intervention. On appeal, Graco argued that CRC was not entitled to recover attorney's fees. The issue was framed as follows:

> Graco argues that because State Farm rather than CRC retained [the attorney], CRC incurred no obligation to pay [the attorney] and, thus, CRC incurred no compensable losses. CRC asserts the collateral source rule allows it to recover fees incurred by State Farm on CRC's behalf.

*Graco*, 47 S.W.3d at 745. The appellate court agreed with CRC that the collateral source rule allowed it to recover the attorney's fees that State Farm had paid. The opinion addressed the matter thusly:

> The collateral source rule bars a wrongdoer from offsetting his liability by insurance benefits independently procured by the injured party.... Under the collateral

source rule, Graco would not be relieved of its duty to pay CRC's attorney's fees merely because CRC's defense was provided by State Farm. Graco argues the collateral source rule does not apply because the issue does not concern who paid [the attorney's] fees, but rather who incurred the fees....

....

We conclude that the collateral source rule applies to this case and, therefore, CRC incurred the legal fees and expenses that were provided by CRC's insurance company. When CRC purchased insurance from State Farm, CRC paid State Farm to provide legal representation for CRC in such litigation. Chapman, although retained and paid by State Farm, provided services to State Farm's insured, CRC, valued at $107,859.82.... Because the collateral source rule applies, we conclude the evidence supports the trial court's finding CRC incurred $107,859.82 in legal fees and expenses in this cause.

*Graco,* 47 S.W.3d at 744–46 (internal citations omitted). Additionally, even though Graco successfully had State Farm dismissed from the case, Graco also argued on appeal that "because State Farm actually incurred the legal expense in this action, State Farm is the real party in interest." *Graco,* 47 S.W.3d at 746. The appellate court rejected the argument as follows:

Graco contends State Farm should be allowed recovery only upon proving Graco's liability in the underlying product liability case....

Graco's argument is without merit.... [T]he trial court awarded judgment to CRC, not to State Farm. State Farm's intervention was dismissed with prejudice....

Moreover, we disagree with Graco's premise that the claim for attorney's fees necessarily belongs to State Farm. A claim for attorney's fees belongs to the litigant, not to his attorney.... We likewise conclude, in this case, that the claim for attorney's fees belongs to CRC rather than to State Farm.

*Graco,* 47 S.W.3d at 746–47 (internal citations omitted).

The court in *Fust v. Francois,* 913 S.W.2d 38 (Mo.Ct.App.1995), also addressed the issue of the application of the collateral source doctrine to attorney's fees paid by an insurer in an underlying action. In *Fust,* the plaintiffs brought an action for malicious prosecution against the defendants as a result of an earlier unsuccessful lawsuit that the defendants had brought against them. The plaintiffs' legal fees in the underlying action were paid by an insurer. Even so, the plaintiffs obtained a judgment against the defendants that included recovery of attorney's fees incurred in the previous action. On appeal, the defendants argued that the trial court committed error in granting the plaintiffs' motion in limine to exclude any testimony showing that the plaintiffs did not pay any attorney's fees in defending the underlying action. The defendants contended that insofar as the plaintiffs' insurer paid the attorney's fees, the plaintiffs should not have been allowed to recover the same. The appellate court disagreed:

[W]e find the court did not abuse its discretion in ruling the evidence inadmissible. The use of the collateral source rule was recently articulated by the Missouri Supreme Court in the case *Washington v. Barnes Hosp.,* 897 S.W.2d 611 (Mo. banc 1995). In *Washington,* the ... court thoroughly reviewed the case law applying the collateral source rule and the underlying reasons for its application. One reason identified by the court and which applies to the present case is the "benefit of the bargain" rationale, *i.e.* the plaintiff who contracts for insurance with his or her own funds should receive that benefit without it being disclosed.... The common rationale for the rule is that a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him, or, stated more succinctly, the wrongdoer may not be benefited by collateral payments made to the person he has wronged....

[The defendants] argue[ ] the evidence was not meant to get an offset or credit against damages but to rebut the [plain-

tiffs'] claim of the existence of damages—the fact of damages. It is well-settled that damages need not be proved with exact certainty, but rather it is the fact of damages, not the amount of damages, that must be proven with reasonable certainty....

In the malicious prosecution context, there was testimony concerning the services of the law firm and the amount of those services. Such testimony is sufficient evidence of damages. Whether the [plaintiffs] were the ones who in fact paid the law firm directly for the services is irrelevant.

*Fust,* 913 S.W.2d at 47 (internal quotations and citations omitted). *See also Worsham v. Greenfield,* 435 Md. 349, 78 A.3d 358, 371 (2013) ("[W]e hold that a party compelled to defend him or herself ... may recover the costs associated with that litigation ..., regardless of whether those costs were paid by that party or by an insurance company or by another third person on the party's behalf."); *Otis Elevator, Inc. v. Hardin Const. Co. Grp., Inc.,* 316 S.C. 292, 450 S.E.2d 41, 46 (1994) (applying collateral source rule to prevent defendant from "receiv[ing] the benefit of an insurance contract for which [plaintiff] paid the premiums").

In the bankruptcy proceeding of *In re EBW Laser, Inc.,* Nos. 05–10220C–7G & 05–10221C–7G, 2012 WL 3490417 (Bkrtcy. M.D.N.C. Aug. 14, 2012), the Trustee of the estate of two debtors sought damages from three respondents who had wrongfully sued the Trustee while the bankruptcy proceeding was pending. The Trustee was seeking to recover the attorney's fees he had incurred in the respondents' underlying wrongful lawsuit. The respondents argued that the Trustee was not entitled to recover the attorney's fees because the fees were paid by an insurer. The bankruptcy court rejected the argument as follows:

The Respondents urge that the assessment of damages covering the fees ... is unnecessary because the fees were paid by the malpractice insurance carrier for the Trustee and his law firm. This objection requires consideration of the collateral source rule. Under the collateral source rule, a plaintiff's recovery will not be diminished by benefits received from a source independent of the wrongdoer. .... The policy underlying the rule focuses on the inherent unfairness of improving the defendant's position through consideration of payments made independently to the plaintiff.... At least one bankruptcy court has determined that the collateral source rule applies to preclude diminishment of sanctions damages including attorney fees. *In re Briggs,* 143 B.R. 438, 463–64 (Bankr.E.D.Mich.1992). In *Briggs,* the creditor sought a reduction in the attorney fees assessed as sanctions based on the debtor having obtained legal representation pursuant to a legal services plan. .... The debtor had purchased the plan in advance of the bankruptcy as an employee benefit.... Invoking the collateral source rule, the court found that the sanctioned party should not benefit from the debtor having available insurance obtained by the debtor through his employer.... These same considerations are applicable in this case. The Trustee and his law firm paid the price required to purchase malpractice insurance which was completely independent of the Respondents. The payments cited by the Respondents are the proceeds from a collateral source. Pursuant to the collateral source rule, the Respondents should not be relieved of responsibility for their wrongful conduct as a result of the payments which were in no way contributed to by the Respondents.

*In re EBW,* 2012 WL 3490417, at *19 (internal citations omitted). *See also Broaddus v. Shields,* No. 08C4420, 2010 WL 4684033, *2 (N.D.Ill.2010) ("[U]nder the collateral source rule, the fact that Griffin Capital's insurer may have paid certain attorney's fees does not absolve Broaddus from paying any such fees"[.] ).

The cases cited above did not involve a breach of a contract on the part of the defendants to provide legal counsel for the plaintiffs in the underlying actions. This point is critical because a majority of courts do not apply the collateral source rule to a breach of contract claim in which a plaintiff seeks recovery of attorney's fees paid by another

insurer. These courts have held that "[t]he collateral source rule, if applied to an action based on breach of contract, would violate the contractual damage rule that no one shall profit more from the breach of an obligation than from its full performance." *Pan Pacific Retail Props., Inc. v. Gulf Ins. Co.,* 471 F.3d 961, 973 (9th Cir.2006) (internal quotations and citation omitted). *See also Bramalea California, Inc. v. Reliable Interiors, Inc.,* 119 Cal.App.4th 468, 472, 14 Cal.Rptr.3d 302 (Cal.Ct.App.2004) ("[T]he collateral source rule applies to tort damages, not to damages for breach of contract.").

However, at least one court does, in fact, "apply the collateral source rule to causes of action in contract, as well as to actions in tort." *Citizens Prop. Ins. Corp. v. Hamilton,* 43 So.3d 746, 751 (Fla.Dist.Ct.App.2010). For example, in *Bangert v. Beeler,* 470 So.2d 817 (Fla.Dist.Ct.App.1985), the plaintiffs brought an action against two defendants after the defendants refused to provide them with legal representation in an underlying action.[1] The trial court found that the plaintiffs could not recover the attorney fees paid in the underlying action because their insurer had paid for the same. The plaintiffs appealed and argued that they should be allowed to recover the attorney's fees paid by their insurer. The appellate court agreed:

In *Walker v. Hilliard,* 329 So.2d 44 (Fla. 1st DCA 1976), we held that *the collateral source rule applies not only in tort, but also in contract.* Thus, a tractor seller who breached the warranty of title was liable for the full amount of damages even though the buyer's insuror paid the buyer for some of the damages. Here, the party that breached the warranty to defend title is likewise liable for the full amount of damages. The breaching party should not be rewarded when the wronged party's collateral source is wholly independent of the breaching party.

At the oral argument on this case, counsel for [defendants] contended the collateral source rule should not apply because there is no evidence that the [plaintiffs]

bought the title insurance policy, and that it was probably purchased by [someone else]. We have examined the record and find Mr. Bangert [plaintiff] testified, without contradiction, that he procured and paid for the policy.

*Bangert,* 470 So.2d at 818 (emphasis added).

In sum, the case law around the country is clear in holding that, in a tort action arising from an underlying action, a plaintiff may recover attorney's fees paid on his or her behalf by an insurance company in the underlying action. Although a majority of courts preclude such recovery on a breach of contract claim, at least one jurisdiction permits such a recovery.

In the instant proceeding, the record indicates that Morlan's claims are based, in part, upon statutory and common law bad faith causes of action. Our cases have made clear that statutory and common law bad faith claims are tort actions. *See Cava v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 232 W.Va. 503, 505, 753 S.E.2d 1 (2013) ("The petitioners' ... complaint ... set [sic] forth two tort causes of action: (1) common law 'bad faith' and (2) violations of the West Virginia Unfair Trade Practices Act."); *Noland v. Virginia Ins. Reciprocal,* 224 W.Va. 372, 383, 686 S.E.2d 23, 34 (2009) ("The prior decisions of this Court have clearly indicated that a common law bad faith claim sounds in tort."); *Wilt v. State Auto. Mut. Ins. Co.,* 203 W.Va. 165, 167, 506 S.E.2d 608, 610 (1998) ("[T]his Court has previously determined that unfair settlement claims are tortious in nature"); Syl. pt. 4, *Poling v. Motorists Mut. Ins. Co.,* 192 W.Va. 46, 450 S.E.2d 635 (1994) ("Violation of W. Va.Code, 33–11–4(9) [1985] is tortious conduct that may give rise to a cause of action by a spouse for loss of consortium."). Insofar as Morlan's bad faith claims are tort causes of action, under the majority rule in the country the collateral source rule should be applied to allow Morlan to recover the attorney's fees Westfield paid on its behalf in the underlying case. Failure to appreciate the applicability of the collateral source rule to the facts of this case demon-

---

1. The underlying action involved property the plaintiffs had purchased from the defendants. The defendants were contractually obligated to

defend title to the property by providing legal counsel for the plaintiffs.

strates a patent lack of understanding of this most basic equitable concept.

In the final analysis, the dissent is absolutely wrong in arguing that Morlan cannot recover the attorney's fees paid by Westfield.

For the foregoing reasons, I concur.

LOUGHRY, Justice, concurring:

I concur in the judgment of the majority in denying the petitioner's request for a writ of prohibition.[1] I write separately to explain why I believe extraordinary relief should be parsimoniously granted rather than serving as an interlocutory review of a trial court's pretrial rulings.

The petitioner has sought a writ of prohibition to reverse various pretrial orders entered by the trial court. These orders involve rulings on a choice of law issue, the denial of the petitioner's motion to dismiss for lack of personal jurisdiction, the award of partial summary judgment in favor of respondent Morlan Enterprises allowing its claim against the petitioner for first party bad faith and Unfair Trade Practices Act violations to proceed, and the grant of a motion *in limine* prohibiting the petitioner from presenting evidence of the payment of attorney's fees, which are sought by Morlan, but which were paid by another source.

In determining whether to issue a writ of prohibition, I first observe that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court.... W.Va.Code, 53–1–1." Syl. pt. 2, in part, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977); *see also State ex rel. Allen v. Bedell*, 193 W.Va. 32, 37, 454 S.E.2d 77, 82 (1994) (Cleckley, J., concur-

ring) ("Mere doubt as to the correctness of a trial court's ruling on a motion *in limine* regarding an evidentiary issue is an insufficient basis to invoke this Court's writ power."). Indeed, "[i]n the absence of compelling evidence of irremediable prejudice, a writ of prohibition will not lie to bar trial based upon a judge's pretrial ruling on a matter of evidentiary admissibility." Syl. Pt. 2, *State ex rel. Williams v. Narick*, 164 W.Va. 632, 264 S.E.2d 851 (1980).

I further observe that decades ago, this Court explained that "[t]he writ of prohibition ... does not lie to correct mere errors; and it cannot be allowed to usurp the functions of appeal, writ of error or *certiorari.*" *State ex rel. City of Huntington v. Lombardo*, 149 W.Va. 671, 679, 143 S.E.2d 535, 541 (1965). This Court has also cautioned that it

> will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Syl. Pt. 1, in part, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979). More recently, in Justice Cleckley's well-reasoned concurrence in *Bedell*, he explained that

> [t]he " '[l]iberal allowance' " of extraordinary writs " 'degrades the prominence of the trial' " and it undermines our statutory

---

1. In syllabus point four of *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996), we explained that

> [i]n determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribu-

nal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

provisions limiting appellate review to final judgments. *Brecht v. Abrahamson*, 507 U.S. 619, —— –—— [635], 113 S.Ct. 1710, 1720–21, 123 L.Ed.2d 353, 371 (1993), quoting *Engle v. Isaac*, 456 U.S. 107, 127, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783, 800 (1982).

*Bedell*, 193 W.Va. at 36, 454 S.E.2d at 81. As Justice Cleckley expounded,

> When appropriate, writs of prohibition and mandamus provide a drastic remedy to be invoked only in extraordinary situations. * * * *
>
> [t]o justify this extraordinary remedy, the petitioner has the burden of showing that the lower court's jurisdictional usurpation was clear and indisputable and, because there is no adequate relief at law, the extraordinary writ provides the only available and adequate remedy. Thus, writs of prohibition, as well as writs of mandamus and habeas corpus, should not be permitted when the error is correctable by appeal.

*Id.*, 193 W.Va. at 37, 454 S.E.2d at 82. Admittedly, these are extremely high hurdles that a party must clear before extraordinary relief will be granted, as I believe they should be, but I also believe that if these hurdles are met, extraordinary relief should be granted.

In the case at bar, however, like the majority, I see no clear error or excess of legitimate power in the case at bar that is not "correctable by appeal." *Bedell*, 193 W.Va. at 37, 454 S.E.2d at 82. As Justice Cleckley suggested, a factor to be considered in determining whether extraordinary relief is appropriate is "[w]hether the damage *(other than expense and time)* or prejudice suffered by the petitioner is correctable on appeal[.]" *Id.* (emphasis added). Thus, the fact that the parties will expend time and money as the litigation proceeds below does not entitle the petitioner to extraordinary relief, nor should prohibition be used for "the purpose of appealing cases upon the installment plan." *State ex rel. Shelton v. Burnside*, 212 W.Va. 514, 519, 575 S.E.2d 124, 129 (2002) (quoting *Wimberly v. Imel*, 358 P.2d 231, 232 (Okla. Crim.App.1961)); *see also Bedell*, 193 W.Va. at 37, 454 S.E.2d at 82 (Cleckley, J., concur-

ring) ("Unfortunately, in West Virginia the writ of prohibition has been used with increasing frequency as a device to escape from the 'final judgment' rule.").

As indicated above, the petitioner seeks extraordinary relief from the trial court's pretrial rulings involving a motion *in limine*, personal jurisdiction, choice of law, and whether respondent Morlan is a first party insured under the policy issued by the petitioner. While I am disappointed that the majority did not undertake a more thorough and complete analysis of these issues, upon consideration of the parties' arguments and the procedural posture of this litigation, I cannot conclude that there is "compelling evidence of irremediable prejudice." Syl. Pt. 2, in part, *Narick*, 164 W.Va. 632, 264 S.E.2d 851. Accordingly, I agree with the majority that under the factors set forth in *Hoover*, these are issues that can be considered on appeal following a final order of the circuit court.

For these reasons, I concur in the majority's decision to deny extraordinary relief in this matter. I am authorized to state that Justice Workman joins in this separate opinion.

Justice KETCHUM, concurring, in part, and dissenting, in part:

I agree with the majority that, on the first three claims made by Owners Insurance, the writ of prohibition should be denied. There just wasn't enough in the record to conclude that the circuit court has exceeded its legitimate authority.

Still, I dissent because I would have granted a writ of prohibition on the fourth error, which pertains to the theory that Morlan Enterprises can collect damages for attorney fees and expenses ("defense costs") paid by its insurer, Westfield Insurance. I believe that the learned trial judge was absolutely right that those defense costs were a collateral source to Morlan. The problem is, Morlan has absolutely no cause of action or legal right to collect those defense costs from Owners Insurance. Because it is a "clear error of law" to allow Morlan to try and collect those defense costs, I would have

granted the writ as moulded. *See* Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996) ("the existence of clear error as a matter of law, should be given substantial weight").

Before I discuss the case, let me say one additional thing. This case is a typical example of where the lawyers didn't give a good trial judge a chance to rule correctly. Too often, lawyers don't provide the judge with the right law on the issue; they just argue from their gut and pound on the table.[1] Trial judges are not encyclopedias of the law. They deal with many different legal issues every day. The lawyers must present the judge with the correct law when novel questions are raised in their cases.

The relevant underlying facts of this case are these: Bobby Messer was severely injured when he touched a live power line. Among others, he sued the two companies that energized the power line: Morlan Enterprises, and its subcontractor Paul Kerns. Morlan was insured by Westfield Insurance Company; Kerns was insured by petitioner Owners Insurance Company. However, at the request of Kerns, Owners had issued a certificate of insurance listing Morlan Enterprises as an "additional insured" on Kerns's liability policy.

In the lawsuit, Morlan Enterprises was defended by its liability insurance carrier, Westfield. Westfield hired and paid a defense lawyer's fees and costs. Under the terms of the policy, Morlan did not hire and had no obligation to pay the defense lawyer. Meanwhile, Owners Insurance defended Kerns from the lawsuit, but initially denied coverage to Morlan, its "additional insured." However, Owners Insurance ultimately relented and settled the case for both Morlan and Kerns, and plaintiff Messer released all of his tort claims.

After the settlement, Morlan filed a third-party complaint against Owners Insurance for initially denying coverage and failing to provide a defense. The complaint alleged first-party bad faith and, among other damages, Morlan seeks to collect from Owners Insurance all of the defense costs paid by Westfield Insurance.

Judge McGraw presciently ruled that, under the collateral source rule, Owners Insurance can't mention at trial that Morlan's insurance carrier (Westfield) paid all of Morlan's defense costs. Owners Insurance has—incorrectly—argued that because those defense costs were never "incurred or paid" by Morlan that the collateral source rule doesn't apply.

We rejected the precise argument made by Owners Insurance in our recent case of *Kenney v. Liston*, 233 W.Va. 620, 760 S.E.2d 434, 2014 WL 2565563 (No. 13–0427, June 4, 2014), where we expounded upon the collateral source rule in West Virginia. In *Kenney*, this Court explicitly rejected the idea that the collateral source rule "operates solely to protect 'payments.'" The collateral source rule protects a plaintiff's right to recover the reasonable value of their damages, not merely "the expenditures actually made or obligations incurred." *Id.*, Syllabus Point 6. As the Court stated in Syllabus Point 4,

> The collateral source rule protects payments made to or benefits conferred upon an injured party from sources other than the tortfeasor by denying the tortfeasor any corresponding offset or credit against the injured party's damages. Even though these collateral sources mitigate the injured party's loss, they do not reduce the tortfeasor's liability.

My reason for dissenting is this: for a plaintiff to avail him/her/itself of the collateral source rule, the plaintiff must first have a viable cause of action for the injury, harm, or damages they seek. Here, the cause of action for payment of defense costs does not belong to the plaintiff, Morlan Enterprises. Instead, the cause of action to recover defense costs belongs unequivocally to Westfield Insurance, who paid these costs. It was Westfield that paid 100% of the defense costs for Morlan in the underlying lawsuit, when Owners Insurance (allegedly) should have paid at least 50%. Hence, it is Westfield that has the cause of action for damages. Let me explain.

---

1. There's an old legal aphorism that goes, "If you have the facts on your side, pound the facts. If you have the law on your side, pound the law. If you have neither on your side, pound the table."

Morlan never paid out a penny to defend the underlying action by Messer. All of those defense costs were paid by Westfield. Owners allegedly had a duty to pay half of those defense costs, but allegedly ducked its duty and stuck Westfield with the entire defense bill. This triggers a cause of action only for Westfield that is known as the "doctrine of equitable contribution."

The doctrine of equitable contribution arises when two (or more) separate insurance companies have the same obligation to cover the same claim. If one insurer pays the claim and the other insurer pays nothing, then the first insurer has an equitable cause of action for contribution for a share of any payouts from the non-paying second insurer. Steven Plitt *et al.*, 16 *Couch on Insurance 3d* § 222:98. "[T]he doctrine of equitable contribution is recognized in the majority of states and provides that an insurer paying more than its fair share of a loss has the right to seek contribution from other insurers whose policies are also impacted." Scott Seaman, Jason Schulze, *Allocation of Losses in Complex Insurance Coverage Claims*, § 5.2 (2nd Ed.2006).[2]

**2.** *See, e.g., Regal Homes, Inc. v. CNA Ins.*, 217 Ariz. 159, 171 P.3d 610, 620 (Ct.App.Div.1 2007); *Marshall v. Raritan Valley Disposal*, 398 N.J.Super. 168, 940 A.2d 315 (App.Div.2008); *CNH Capital v. Janson Excavating, Inc.*, 171 Ohio App.3d 694, 872 N.E.2d 980, 984 (1st Dist.2007); *Heartland Payment Systems, L.L.C. v. Utica Mut. Ins. Co.*, 185 S.W.3d 225 (Mo.Ct.App.E.D.2006); *Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 826 A.2d 107 (2003); *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal.App.4th 1279, 77 Cal.Rptr.2d 296 (1st Dist. 1998); *National Union Fire Ins. Co. v. American Motorists Ins. Co.*, 269 Ga. 768, 504 S.E.2d 673 (1998); *Sharon Steel Corp. v. Aetna Cas. and Sur. Co.*, 931 P.2d 127, 139 (Utah 1997); *Nationwide Mut. Ins. Co. v. Hall*, 643 So.2d 551 (Ala.1994); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993); *National Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d 741 (Colo.1992); *Zurich–American Ins. Cos. v. Atlantic Mut. Ins. Cos.*, 139 A.D.2d 379, 531 N.Y.S.2d 911, 916 (1st Dep't 1988), order aff'd, 74 N.Y.2d 621, 541 N.Y.S.2d 970, 539 N.E.2d 1098 (1989); *National Indem. Co. v. St. Paul Ins. Cos.*, 150 Ariz. 458, 724 P.2d 544 (1986); *Indiana Ins. Co. v. Sentry Ins. Co.*, 437 N.E.2d 1381 (Ind.Ct.App. 1982); *Royal Globe Ins. Co. v. Aetna Ins. Co.*, 82 Ill.App.3d 1003, 38 Ill.Dec. 449, 403 N.E.2d 680 (1st Dist.1980); *Marwell Const., Inc. v. Underwriters at Lloyd's, London*, 465 P.2d 298 (Alaska 1970); *United Services Auto. Ass'n v. Hartford Acc. & Indem. Co.*, 220 Tenn. 120, 414 S.W.2d

"[E]quitable contribution applies *only between insurers*, and only in the absence of contract, and therefore it has no place between insurer and insured, which have contracted the one with the other." 16 *Couch on Insurance 3d* § 222:98 (emphasis added). Applied to this case, Westfield Insurance and Owners Insurance (allegedly) had an equal obligation to provide Morlan with a defense. Westfield provided the defense in the underlying case, and Owners Insurance did not. Now that the underlying case is concluded, the law is clear that Westfield—not Morlan—has a cause of action in equity against Owners to be reimbursed for a share of the defense costs.

Of course, Westfield could assign its cause of action for defense costs to Morlan.[3] But that did not happen. In fact, at oral argument, the parties suggested that Westfield is pursuing its own action against Owners Insurance to be reimbursed its defense costs. If true, and Morlan is allowed to also recover defense costs from Owners, then Owners may unfairly be exposed to double damages.

836, 841 (1967); *Carolina Cas. Ins. Co. v. Oregon Auto. Ins. Co.*, 242 Or. 407, 408 P.2d 198 (1965).

**3.** For example, in *Howard v. Am. Nat. Fire Ins. Co.*, 187 Cal.App.4th 498, 115 Cal.Rptr.3d 42 (2010), numerous plaintiffs claimed they were molested by a priest over many years, and sued the bishop who negligently retained the priest. The bishop contacted three liability insurers who provided coverage over the years. Two insurers provided a defense to the bishop; the third said there was no coverage and refused a defense. The plaintiffs recovered judgments that exhausted the limits of the first two insurers' policies.

The bishop then brought a bad faith action against all three insurers. The first two insurers assigned their cause of action against the third insurer for defense costs to the bishop and the plaintiffs. The third insurer claimed that "its failure to defend was not an actionable breach because the Bishop suffered no damages since other insurers provided a defense." 187 Cal. App.4th at 521, 115 Cal.Rptr.3d at 63. The California court rejected this theory because, "It is well established that an insurer that defends the insured is entitled to equitable contribution from a coinsurer that fails to defend." *Id.* at 523, 115 Cal.Rptr.3d at 64. The California court allowed the bishop and plaintiffs to proceed with the cause of action for defense costs that had been assigned to them.

The learned trial judge did not consider the doctrine of equitable contribution for a salutary reason: the parties never raised, briefed, or discussed the issue. As this case goes forward, the obligation to do the research lies with the lawyers, not the judge. I dissent because the law of equitable contribution is so clear, and I believe Morlan Enterprises should be prohibited from pursuing the defense costs paid by Westfield from Owners.

On remand, the parties and the circuit court should not feel restrained from raising the doctrine of equitable contribution. The parties should research the law, and provide the law on equitable contribution to the trial judge. I believe that, in the absence of an assignment from Westfield Insurance to Morlan Enterprises, the law is clear: Morlan Enterprises has no legal basis for pursuing defense attorney fees and expenses from Owners Insurance.